**LUDEN'S, INC.**

**v.**

**LOCAL UNION NO. 6 OF THE BAKERY, CONFECTIONERY AND TOBACCO WORKERS INTERNATIONAL UNION OF AMERICA; American Arbitration Association.**

**Civ. A. No. 92–1545.**

United States District Court, E.D. Pennsylvania.

Nov. 6, 1992.

---

Dana Stevens Scaduto, Harrisburg, Pa., for plaintiff.

Bernard N. Katz, Lynn P. Fox, Kenneth Egger (AAA), Philadelphia, Pa., for defendant.

OPINION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

Plaintiff, Luden's, Inc. (Luden's), commenced this action on March 16, 1992 against Defendant, Local Union No. 6 of the Bakery, Confectionery and Tobacco Workers International Union of America (the Union) and the American Arbitration Association (AAA), seeking a declaratory judgment as to the arbitrability of a dispute arising between Luden's and the Union over the retroactivity of wages negotiated between the parties on November 1, 1991. Luden's also seeks to enjoin an arbitration proceeding which is currently scheduled to resolve this dispute. Presently before the Court are the parties' cross-motions for summary judgment filed on August 14, 1992.

We have carefully reviewed the cross-motions, the stipulated facts and attached exhibits, as well as the memoranda of law submitted by the parties[1]. For the reasons stated below, plaintiff's motion for summary judgment is granted, and defendant's cross-motion for summary judgment dismissing plaintiff's complaint and requesting an Order directing plaintiff to proceed with the scheduled arbitration, is denied.

## II. SUMMARY JUDGMENT STANDARD

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the

---

1. On October 14, 1992, we ordered the parties to address the applicability of the Supreme Court's decision in *Litton Financial Printing Div. v. NLRB,* 501 U.S. ——, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991) to the present dispute.

suit under governing law. *Id.* at 248, 106 S.Ct. at 2510. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying for the court those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. at 2552 n. 3 (quoting Fed.R.Civ.P. 56(e)); *see First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

### III. STIPULATED FACTS

The parties have stipulated to the following facts out of which this dispute arises.

On May 1, 1988, Luden's and the Union executed a collective-bargaining agreement (1988 CBA or Agreement) setting forth the terms and conditions of employment at Luden's Reading, Pennsylvania plant. (Stipulation of Facts, ¶ 1). The 1988 CBA sets forth a five step procedure by which employees can seek resolution of grievances arising from their employment[2]. The 1988 CBA also sets forth the duration of the Agreement[3].

On February 14, 1991, the Union, by its President, Joseph Rauscher, sent a letter to Donald B. Watson, Plant Manager of Luden's, enclosing a Notice to Mediation Agencies. (Stipulation of Facts, ¶ 2). The letter, captioned "60 DAY NOTICE", stated "[p]ursuant to the provisions of the Labor Management Relations Act of 1947, you are hereby notified that we intend to change, modify or terminate the Collective Bargaining Agreement presently in force between your Company and our Union." (Stipulation of Facts, Exhibit B).

Meetings between Luden's and Union representatives to discuss terms of a new collective-bargaining agreement commenced on March 11, 1991, prior to the April 29 expiration date set by the 1988 CBA. (Stipulation of Facts, ¶ 3). A series

**2. ARTICLE XVI—SETTLEMENT OF GRIEVANCES AND ARBITRATION**

Step I. Any employee who believes that he has a grievance which involves only him shall discuss the grievance with his or her Department Supervisor within three (3) days of the time the alleged grievance became known to the employee.

Step II. If the grievance has not been answered by the Department Supervisor satisfactorily to the employee in Step I within three (3) days submission to him, the employee must file the grievance with his or her steward in writing and give it to the foreman within the next three (3) days. A copy of the grievance must also be given to the Union Office by the Steward.

Step III. The Company shall give an answer to the Union in writing after receiving the grievance.

Step IV. If no settlement is reached by Step III, the officials designated by the Company shall meet with the aggrieved employee, shop steward and business agent as soon as possible thereafter.

Step V. Where the parties have been unable to reach a mutually satisfactory resolu-

tion of the grievance at Step IV, either party may request the American Arbitration Association to submit a list of arbitrators for the consideration of the parties. Thereafter, the matter, unless settled, shall be processed to arbitration in accordance with the rules and procedures of the AAA.

. . . .

(Stipulation of Facts, Exhibit A).

**3. ARTICLE XXIX—DURATION OF AGREEMENT**

This Agreement shall be and remain in full force and effect for a period of three (3) years until and including April 29, 1991, and thereafter, until a new agreement, the wage clause of which shall be retroactive to the above given date, has been consummated and signed, or until this Agreement, upon sixty (60) days notice in writing, has been terminated by the Union with the sanction of the Bakery, Confectionery and Tobacco Workers International Union of America or has been terminated by the Company.

(Stipulation of Facts, Exhibit A).

of negotiations took place between the Union and Luden's both before and after the April 29 expiration date.[4] (Stipulation of Facts, ¶ 3). On April 29, 1991, the scheduled expiration date of the 1988 CBA, Donald B. Watson notified Union employees of the status of negotiations. (Stipulation of Facts, ¶ 5). Watson's notice stated, "[Luden's and the Union] have agreed to disregard the deadline of April 30, and continue operating under the terms of the current contracts." (Stipulation of Facts, Exhibit F).

During the course of negotiation, Luden's and the Union's negotiating committee made several offers and counteroffers for terms of a new contract. (Stipulation of Facts, ¶¶ 4, 6, 8, 10). On May 3, May 16, June 6, and July 15–19 (collectively), Luden's sent letters to the Union and its members informing them of the company's bargaining position and urging them to accept its contract offers at their Union ratification meetings. (Stipulation of Fact, Exhibits G–J). Each of these letters stated that wages would be paid retroactively to April 29 if the offer was accepted. (*Id.*[5]). Each of these offers was rejected by the Union. (Stipulation of Facts, ¶¶ 4, 7, 9, 12). In addition, the May 3, 1991 letter from Mr. Watson to Union Business Representative Francis Ryan stated, "[p]ursuant to Article XXIX of our contract, I am hereby notifying you that we are terminating the contract effective 12:01 AM Monday May 13, 1991." (Stipulation of Facts, Exhibit G).

Concurrent with the ongoing negotiations, the Union filed an unfair labor practice charge with the National Labor Relations Board (NLRB) on May 29, 1991. (Stipulation of Facts, ¶ 13). In their charge, the Union alleged that Luden's had

"deliberately violated its obligations to bargain in good faith by both threatening improper actions and by undermining and bypassing the bargaining representatives of the employees." (Stipulation of Facts, Exhibit K). On July 2, 1991, the Union filed an amended charge (Stipulation of Fact, ¶ 14) further alleging that Luden's had engaged in illegal "surface bargaining behavior by having preconceived inflexible positions with regard to its entire package and with special regard to its pension and health and welfare positions." (Stipulation of Facts, Exhibit L).

In a letter dated August 30, 1991, Peter Hirsch, Regional Director for the National Labor Relations Board informed the Union's counsel that the NLRB would not issue a complaint. (Stipulation of Fact, ¶ 15). Specifically, the NLRB found that Luden's had not engaged in unlawful direct dealing or made unlawful threats because Luden's letters to the Union employees "did not contain any coercive statement, did not invite direct bargaining with the Employer, and the information fairly represented the Employer's bargaining position as previously presented to the Union." (Stipulation of Facts, Exhibit M). In addition, the NLRB found that Luden's did not engage in surfacing bargaining because it "met and bargained with the Union and attended all scheduled negotiating sessions." (*Id.*).

The Union appealed the decision of the Regional Director by a Notice of Appeal dated September 6, 1991 and a supplemental filing dated September 30, 1991. (Stipulation of Facts, ¶ 16). In the appeal, the Union contended that Luden's general distribution of the May 3, May 16 and July 15, 1991 letters (see *supra* note 5) to Union

---

**4.** Besides the initial March 11 meeting, meetings were held on March 21, April 2, April 3, April 10, April 12, April 16, April 23, April 26, May 16, May 24, June 20, August 6, September 30 and November 1. (Stipulation of Fact, ¶ 3).

**5.** May 3, 1991 letter (Exhibit G):
"Should it be accepted we will pay retroactive wages to Monday April 29, 1991. Should it be rejected we agree to continue normal operations and continue discussions but there will be no retroactive payments."
May 16, 1991 letter (Exhibit H):

"Wages will be paid retroactive to April 29, 1991 should this entire package be accepted by Mon. evening May 20, 1991."
June 20, 1991 letter (Exhibit I):
"Wages will be paid retroactive to April 29 should this package be accepted by the membership."
July 15, 1991 letter (Exhibit J):
"Wages will be paid retroactive to April 29, 1991, should you accept revised language for Article XXIX...."

employees was "a blatant attempt to intimidate and coerce its employees into accepting the employer's proposal when it advised that 'should it be rejected ... there will be no retroactive payments.'" (Stipulation of Facts, Exhibit O).

In a letter dated October 18, 1991, the General Counsel for the NLRB denied the Union's appeal. (Stipulation of Facts, ¶ 17). In addressing the Union's contention that the conditioning of retroactive wage increases on ratification by a certain date was coercive activity indicative of direct dealing, the General Counsel's decision stated:

> It is not clear from the wording of the Article XXIX whether a 60–day notice of termination of the contract is necessary after the contract term expires.... Furthermore, even if we assume that Article XXIX required the Employer to give sixty days notice to terminate the contract, the letter of July 18 was sent more than 60 days after the Employer gave notice that it was terminating the contract, as per its letter of May 3, and thus the obligation to retain retroactivity was dissolved. While under this interpretation the May 17 letter would have been sent while the contract was still in effect, it was concluded that the statement referring to retroactive wage increases in the letter does not rise to the level of being coercive. Rather, the letter reflected the Employer's bargaining position and the Union was free to express its opinion that retroactivity of wages was required under the previous contract.

(Stipulation of Facts, Exhibit P).

Finally, on November 1, 1991, during a negotiating meeting, Luden's presented another offer to the Union's negotiating committee for consideration. (Stipulation of Facts, ¶ 18). The November 1 offer was silent with respect to the issue of retroactive wages. (Stipulation of Facts, Exhibit Q). The rank and file membership of the Union voted to accept certain benefits and terms of the November 1 offer. (Stipulation of Facts, ¶ 19).

On November 11, 1991, Luden's posted a Notice listing the pertinent details of the contract ratified on November 2, 1991. (Stipulation of Facts, ¶ 20). The Notice stated that the new pay rates would be effective November 4, 1991. (Stipulation of Facts, Exhibit R). Following the November 2 ratifying vote, Luden's prepared a new Agreement for signature by the parties, reflecting Luden's understanding of the terms of the vote and the November 11 Notice. (Stipulation of Facts, ¶ 21). Like the November 11 Notice, Schedule A to this Agreement provides a November 4, 1991 effective date for the new pay rates. (Stipulation of Facts, Exhibit S). This Agreement also modified Article XXIX, which now provides:

**ARTICLE XXIX—DURATION OF AGREEMENT**

This Agreement shall continue in full force and effect until May 1, 1994, and from year to year thereafter, unless written notice is received by either party from the other on or before sixty (60) days prior to the expiration date, requesting that this Agreement be amended or terminated.

(*Id.*).

The Union's counsel, by letter dated March 10, 1992, advised Luden's that it was the Union's position that the Agreement prepared by Luden's incorrectly indicated the effective date of the wage increase. (Stipulation of Facts, ¶ 22). According to the Union, the wage increase should be effective on May 1, 1991, "by operation of the contract." (Stipulation of Facts, Exhibit T)[6].

To date, no new collective-bargaining agreement has been signed by the parties. (Stipulation of Facts, ¶ 23). The parties dispute the arbitrability of the question of the retroactive application of wages. (Stipulation of Facts, ¶¶ 26, 27). Arbitration

---

**6.** Previously, the Union's counsel, by letter dated January 17, 1992, requested the American Arbitration Association to provide an arbitrator for purposes of resolving a "disagreement concerning the question of retroactivity of the negotiated wage increase." (Stipulation of Facts, ¶ 24, Exhibit U).

before the AAA is currently scheduled for November 9, 1992.

The parties agreed to submit the issue of arbitrability of this dispute for disposition by this court on cross-motions for summary judgment and supporting briefs, without necessity for hearing or trial. (Stipulation of Facts, ¶ 31). Furthermore, the parties agreed that resolution of the arbitrability of the retroactive wage issue is based solely and exclusively on the documents referred to in the Stipulation of Facts. (Stipulation of Facts, ¶ 29).

## IV. DISCUSSION

In *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648–51, 106 S.Ct. 1415, 1418–20, 89 L.Ed.2d 648 (1986), the Supreme Court set forth the following principles which provide the framework for analyzing this dispute. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Id.* at 648, 106 S.Ct. at 1418, (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). This principle recognizes that an arbitrator's authority to resolve a dispute exists only when "the parties have agreed in advance to submit such grievances to arbitration." *AT & T*, 475 U.S. at 648–49, 106 S.Ct. at 1418.

■ Second, the question of whether a collective-bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for a court, rather than an arbitrator, to decide. *Id.* at 649, 106 S.Ct. at 1418. This is so because "[t]he willingness of parties to enter into agreements that provide for arbitration of specified disputes would be 'drastically reduced' ... if a labor arbitrator had the 'power to determine his own jurisdiction.'" *Id.* at 651, 106 S.Ct. at 1419 (quoting Cox, *Reflections Upon Labor Arbitration*, 72 Harv. L.Rev. 1482, 1509 (1959)).

■ Third, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. *AT & T*, 475 U.S. at 649, 106 S.Ct. at 1419. The rationale behind this principle is that if such an agreement exists, the agreement requires the parties "to submit all grievances to arbitration, not merely those which the court will deem meritorious." *Id.* at 650, 106 S.Ct. at 1419. This principle also recognizes that arbitration is a "stabilizing influence" that may have "therapeutic value." *United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).

■ Fourth, where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T*, 475 U.S. at 650, 106 S.Ct. at 1419, (quoting *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1353). Moreover, where the arbitration clause lacks any express provision excluding a particular grievance from arbitration, "we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *Id.*, (quoting *Warrior & Gulf*, 363 U.S. at 584–85, 80 S.Ct. at 1354). This presumption "furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective-bargaining." *AT & T*, 475 U.S. at 650, 106 S.Ct. at 1419. In the context of an expired bargaining agreement, however, the Supreme Court has refused to apply this presumption wholesale, "for to do so would make limitless the contractual obligation to arbitrate." *Litton Financial Printing Div. v. NLRB*, 501 U.S. ——, ——, 111 S.Ct. 2215, 2227, 115 L.Ed.2d 177 (1991). Under *Litton*, in the context of an expired collective-bargaining agreement the court must determine whether the parties intended to arbitrate the dispute, even if it requires the court to interpret a provision of the expired agreement. *Id.*

With these principles and policies in mind, we now turn to the case at hand.

Our duty is to interpret the 1988 CBA and to determine whether the parties intended to arbitrate grievances concerning retroactive pay. If we determine that the agreement so provides, then it is for the arbitrator to determine the relative merits of the parties' substantive interpretations of the Agreement.

Luden's contends that the retroactive wage dispute is not arbitrable because the duty to arbitrate under the 1988 CBA, being strictly a creature of that contract: (1) necessarily expired when the contract was terminated by the parties; and (2) does not apply to retroactive wage issues arising after termination. Luden's asserts that the Agreement terminated on April 29, 1991, the expiration date provided for in the 1988 CBA, as a result of the Union's February 14, 1991 letter[7]. Alternatively, Luden's asserts that the 1988 CBA was terminated on May 13, 1991 as a result of Luden's May 3, 1991 letter[8]. According to Luden's, once the 1988 CBA was terminated, the retroactive wage provision, like the rest of the Agreement, was no longer binding or enforceable. Luden's further argues that the duty to arbitrate under the 1988 CBA does not apply to issues which have not been processed through the grievance procedure of Article XVI.

In order to resolve the present case, we must undertake a two part inquiry. Because our analysis for determining the arbitrability of this dispute is dictated in part by a finding that it arose after the expiration of the Agreement, we must first determine whether the 1988 CBA was terminated. If we determine that the Agreement

was terminated, we must next decide whether termination of the Agreement abrogated the duty of the parties to arbitrate this dispute.

## A. THE CONTRACT–TERMINATION ISSUE

The first step in our analysis requires us to interpret Article XXIX of the 1988 CBA to determine whether the Agreement has been effectively terminated[9]. Before reaching this issue, however, we must initially determine that the issue regarding the Agreement's termination is not itself subject to arbitration.

■ Because, under the first principle of arbitrability, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *AT & T*, 475 U.S. at 648, 106 S.Ct. at 1418, issues of contract termination or expiration are for judicial decision, not arbitration, unless the parties have agreed to arbitrate such issues. Thus, we must examine the scope of the arbitration clause to determine whether it encompasses disputes over the Agreement's termination.

■ Under Article XVI, "[a]ny employee who believes that he has a grievance which involves only him shall discuss the grievance with his or her Department Supervisor." Under the plain language of the arbitration clause, only disputes involving employee grievances are arbitrable. Accordingly, the termination issue is arbitrable only if it is an "employee grievance". Generally, disputes over contract termination are not "grievances" within the tra-

---

**7.** The Union's letter stated that "[p]ursuant to the provisions of the Labor Management Relations Act of 1947, you are hereby notified that we intend to change, modify or terminate the Collective Bargaining Agreement presently in force between your Company and our Union." (Stipulation of Facts, Exhibit B).

**8.** Luden's May 3, 1991 letter states, "[p]ursuant to Article XXIX of our contract, I am hereby notifying you that we are terminating the contract effective 12:01 AM Monday May 13, 1991."

**9.** Article XXIX reads:

This Agreement shall be and remain in full force and effect for a period of three (3) years until and including April 29, 1991, and thereafter, until a new agreement, the wage clause of which shall be retroactive to the above given date, has been consummated and signed, or until this Agreement, upon sixty (60) days notice in writing, has been terminated by the Union with the sanction of the Bakery, Confectionery and Tobacco Workers International Union of America or has been terminated by the Company.
(Stipulation of Facts, Exhibit A).

ditional meaning of that term. *See New York News Inc. v. Newspaper Guild of New York*, 927 F.2d 82, 84 (2d Cir.1991) ("While the present dispute [over contract termination] arguably arises from the interpretation of the Agreement, [citations omitted] it cannot be characterized as a 'grievance' within the traditional meaning of that term."); *National R.R. Passenger Corp. .v. Boston & Maine Corp.*, 850 F.2d 756, 762 (D.C.Cir.1988) ("If the arbitration clause is a narrow one, covering only specified types of disputes (such as employee grievances), then we must presume that the parties did not intend for disputes over contract duration to be referred to arbitration."); *Purex Corp. v. Automotive, Petroleum and Allied Indus. Employees Union, Local 618*, 705 F.2d 274, 277 (8th Cir. 1983) ("[I]ssues of contract termination or expiration are for judicial decision, not arbitration, unless the parties have agreed to arbitrate such issues. A broad arbitration clause may give rise to such an agreement, but an arbitration clause limited to employee grievances will not."); *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80*, 605 F.2d 1290, 1295 (2d Cir.1979) ("[I]f an arbitration clause covers only employee grievances, the court should not compel arbitration of question of contract termination."). Thus, any dispute over the Agreement's termination is not within the purview of Article XVI, and is not subject to arbitration. Accordingly, we are to decide the contract-termination issue.

The issue for us to resolve is whether under Article XXIX the parties can terminate the 1988 CBA after it expired (*i.e.*, during the interim period between expiration and the signing of a new collective-bargaining agreement) and if so, whether the Agreement was properly terminated.[10]

To resolve this issue, it is necessary for us to interpret the language of Article XXIX in order to determine the intent of the parties when they executed the agreement.

■ Interpretation of a collective-bargaining agreement is governed by substantive federal law. *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 102–04, 82 S.Ct. 571, 576–77, 7 L.Ed.2d 593 (1962). Traditional rules of contract interpretation apply, however, when they are compatible with federal labor policies. *Id.; International Union, UAW v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). While interpreting a contract, we must remain aware that summary judgment may not be appropriate where the contract language is ambiguous. *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 363 (3d Cir.1987). A contract is ambiguous if it is susceptible of more than one meaning. *Id.* at 362. In making the ambiguity determination, we must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings. *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3d Cir.1986). Since the parties have not offered alternative meanings or extrinsic evidence, we will consider only the words of the Agreement.

■ On its face, Article XXIX is unambiguous; either party may terminate the Agreement [11]. The Duration clause clearly states that it is to "remain in full force and effect ... until and including April 29, 1991, and thereafter, *until* a new agreement ... has been consummated and signed, *or until* this Agreement ... has

---

**10.** At the outset, it is important to note that the Union does not dispute Luden's power to terminate the Agreement or that Luden's did terminate the Agreement. The Union argues instead that this dispute is arbitrable "even if the conduct which has triggered the dispute occurred after the contract was terminated." (Def.Mem., p. 3).

**11.** Luden's reads Article XXIX as requiring 60 days notice by the Union but as requiring no

advanced notice by Luden's. We disagree with this reading. By applying the plain, ordinary meaning that attaches to the language, punctuation and placement of the clause, the sixty-day termination provision modifies both the Union's and Luden's right to terminate the Agreement. Accordingly, we interpret the provision as providing either party the power to terminate the 1988 CBA provided 60 days written notice is given.

**322**

been terminated." (emphasis added). Thus, by the clear language of the clause, the Agreement remains in effect after its April 29 expiration date until either: (1) a new agreement is consummated and signed; or (2) the Agreement is terminated. *See Marine Transport Lines, Inc. v. International Org. of Masters, Mates & Pilots,* 636 F.Supp. 384, 387 (S.D.N.Y.1986)

The Duration clause then goes on to set forth the manner in which the Agreement may be terminated. Specifically, the Agreement may be terminated "upon sixty (60) days notice in writing ... by the Union with the sanction of the Bakery, Confectionery and Tobacco Workers International Union of America or ... by the Company." The clause is extraordinarily broad; there are no limitations upon the right to terminate except the requirement of sixty days' written notice. Thus, we find that either party had an unqualified right to unilaterally terminate the Agreement at any time after its expiration upon sixty days notice in writing. *See New York News Inc. v. Newspaper Guild of New York,* 927 F.2d 82, 84–85 (2d Cir.1991). The Duration clause unequivocally embraces the scenario in which Luden's terminates the contract after it expired but while negotiations for a new contract are ongoing. To hold otherwise would be to bind the parties indefinitely to an expired contract until, if ever, a new collective-bargaining agreement is signed. Such a result could lead to a situation where one party, not desiring a change in the expired agreement, could refuse to agree. The party desiring a change in the terms or conditions of the expired agreement would have no recourse.

### B. TERMINATION OF THE AGREEMENT[12]

▮ It is undisputed that on February 14, 1991, the Union sent Luden's a letter which stated "[p]ursuant to the provisions of the Labor Management Relations Act of 1947, you are hereby notified that we intend to change, modify or terminate the Collective Bargaining Agreement presently in force between your Company and our Union." Luden's contends that the Union's letter constitutes a notice of termination under Article XXIX of the Agreement and terminates the 1988 CBA on its scheduled expiration date. We find this argument unpersuasive. First, the Union and Luden's subsequent agreement to "disregard the deadline of April 30" (Stipulation of Facts, Exhibit F) belies any intent on the behalf of the parties to terminate the 1988 CBA on that date. Second, the Union's letter did not invoke the Duration clause, and sought to "change, modify or terminate" and was, therefore, insufficient to terminate the Agreement. For these reasons, we find that the Union's February 14 letter did not terminate the Agreement.

▮ It is also undisputed that Luden's May 3, 1991 letter to the Union stated "[p]ursuant to Article XXIX of our contract, I am hereby notifying you that we are terminating the contract effective 12:01 AM Monday May 13, 1991." Luden's asserts that this letter satisfies the termination provision of Article XXIX. Because the Union does not challenge the adequacy of the language or receipt of this letter, our only question to decide is whether the letter, which provided only ten days notice of termination, was effective to terminate the 1988 CBA. More specifically, we must decide whether Luden's notice of termination was rendered ineffective because it stated a terminal date earlier than the date on which the sixty-day notice would expire.[13]

12. Arguably, the Union, by failing to challenge the Agreement's termination, waives its right to challenge the sufficiency of Luden's May 3 letter. Nonetheless, we feel compelled to address this issue in light of the important federal labor policies surrounding the interpretation and enforcement of collective-bargaining agreements. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

13. Contrary to Luden's contention, the termination issue was not decided by the General Counsel of the NLRB. The narrow issue decided by the NLRB was whether Luden's conduct was coercive, in violation of the National Labor Relations Act. Moreover, had the NLRB decided the termination issue, its interpretation of the Agreement is not entitled to deference. *Litton Financial Printing Div. v. NLRB,* 501 U.S.

 As we previously held, either party to the 1988 CBA had a unqualified right to unilaterally terminate the Agreement provided that sixty days written notice was given to the other party. Ordinarily, clear and specific language in a labor agreement is strictly interpreted. *Irwin v. Carpenters Health and Welfare Trust Fund*, 745 F.2d 553, 556 (9th Cir. 1984). In *Irwin*, the court held that an employer's failure to give notice within the period set by contract[14] was ineffective to terminate the contract. Unlike *Irwin*, and the cases cited therein, the 1988 CBA does not define a window of time, either prior to or after the fixed expiration date, in which the notice must be given. Rather, the 1988 CBA provides that notice of termination may be given at any time after the April 29, 1991 expiration day. Moreover, "it is the general rule that where a contract, whether it be one for employment or for insurance or of a different kind, requires written notice of cancellation upon a stated time, a notice failing to meet the time requirement, but otherwise appropriate, is nonetheless effective upon the lapse of the time required by the contract." *Shain v. Washington Nat'l Ins. Co.*, 308 F.2d 611, 614 (8th Cir.1962) (Blackmun, J.), (citing *Lyon v. Pollard*, 87 U.S. (20 Wall) 403, 407, 22 L.Ed. 361 (1874)); *All States Service Station, Inc. v. Standard Oil Co.*, 120 F.2d 714, 715 (D.C.Cir.1941) (Vinson, J.); *In re Best Film & Video Corp.*, 46 B.R. 861, 873 (B.C.E.D.N.Y.1985). Because we see no reason why this general rule should not be applied in this situation, we will follow the rule that a termination notice is not rendered totally ineffective merely because it

states a period shorter than the Agreement requires[15]. Luden's May 3 letter specifically referred to Article XXIX and notified the Union in clear terms that it was terminating the Agreement. Thus, Luden's failure to provide a termination date sixty days after May 3 does not render the notice ineffective. Instead, termination of the 1988 CBA became effective sixty days after the Union received Luden's May 3 letter[16].

### C. THE POST–TERMINATION ARBITRABILITY ISSUE

 Having decided that Luden's effectively terminated the Agreement, we must determine whether termination of the Agreement extinguishes the parties' duty to arbitrate this dispute. While it is true that arbitration is a matter of contract and that parties cannot be compelled to arbitrate if they did not so agree, it is equally true that termination of a collective-bargaining agreement does not automatically extinguish a party's duty to arbitrate grievances arising under the contract. *Nolde Bros., Inc. v. Bakery & Confectionery Workers Union*, 430 U.S. 243, 251, 97 S.Ct. 1067, 1071, 51 L.Ed.2d 300 (1977).

In *Nolde Bros.*, the Union and employer entered into a collective-bargaining agreement which contained a provision for severance pay on termination of the employment of all employees having three or more years of active service. The agreement, which specified that any grievance arising between the parties was subject to binding arbitration, was to remain in effect until its expiration date and thereafter until execution of a new agreement or the existing

———, ———, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991).

**14.** The agreement in *Irwin* provided that it "shall remain in full force and effect ... unless either party within sixty (60) days prior to the 15th day of June 1974 ... serves written notice on the other of its desire to change, modify, amend or supplement this agreement." *Id.* at 555.

**15.** There are two exceptions to this general rule. First, where an accumulated or vested right would be forfeited if the termination were enforced. *All States Service Station,* 120 F.2d at

715. Second, where the contract affords the noticed party the right during the stipulated period to bring about a condition which will negate the other party's right to terminate. *Carleno Coal Sales, Inc. v. Ramsay Coal Co.*, 129 Colo. 393, 270 P.2d 755 (1954). Since the right to retroactive wages is not vested or accumulated, as discussed in Part IV.C.2 neither of these exceptions apply.

**16.** Although there is no evidence of record of the exact date on which the Union received Luden's May 3 letter, the 1988 CBA clearly terminated prior to the November 1 approval by the Union of a new contract.

agreement was terminated by either party upon seven days written notice. Following the contract's expiration date, the Union gave notice of cancellation, and the contract terminated seven days later. Despite the contract's termination, negotiations for a new collective-bargaining agreement continued. Plant operations ceased four days later, however, when the Union rejected Nolde's latest offer and threatened to strike. The employer paid accrued wages, but refused the Union's demand for severance pay under the collective-bargaining agreement and declined to arbitrate the claim on the ground that its obligation to do so terminated with the collective-bargaining agreement.

In arguing that its members were entitled to severance pay upon the plant's closing, the Union asserted that severance wages provided for in the collective-bargaining agreement were in the nature of "accrued" or "vested" rights, earned by employees as compensation for services performed during the life of the contract but payable, like vacation pay, only upon termination of employment. Nolde, on the other hand, maintained that the duty to arbitrate, being strictly a creature of contract, must necessarily expire with the collective-bargaining agreement that brought it into existence. In ruling that this post-expiration dispute involving the interpretation of a contract clause was subject to arbitration, the Supreme Court held that the dispute "although arising *after* the expiration of the collective-bargaining contract, clearly arises *under* that contract." *Id.* at 249, 97 S.Ct. at 1071 (emphasis in original). After examining the special role of arbitration in the employer-employee relationship and the federal labor policy favoring arbitration, the Court found a presumption in favor of arbitration of disputes over a provision of an expired agreement unless "negated expressly or by clear implication." *Id.* at 255, 97 S.Ct. at 1074.

Citing a "substantial disagreement" as to the proper application of *Nolde Bros.*[17], the Supreme Court in *Litton Financial Printing Div. v. NLRB,* 501 U.S. ——, ——, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991), addressed and refined the *Nolde Bros.* presumption of arbitrability for grievances arising after the expiration or termination of a collective-bargaining agreement.

In *Litton,* the Union and the employer entered into a collective-bargaining agreement which contained a provision that, "in case of layoffs, lengths of continuous service will be the determining factor if other things such as aptitude and ability are equal." *Id.* at ——, 111 S.Ct. at 2219. The agreement, which specified that any differences arising between the parties regarding the agreement were subject to binding arbitration, was to remain in effect until its expiration date. Nearly one year after the agreement's expiration, Litton closed one of its plants and laid off ten workers. The Union filed grievances on behalf of the workers claiming that the employer had violated the layoff provision, but Litton

---

**17.** Prior to the *Litton* decision, the Third Circuit, along with the Fifth and Ninth Circuits, took the position that all post-expiration disputes, not just those involving "accrued rights" under the agreement, were arbitrable. *Yorkaire, Inc. v. Sheet Metal Workers Int'l Ass'n, Local Union No. 19,* 758 F.Supp. 248, 255 (E.D.Pa.1990), *aff'd without opinion,* 931 F.2d 53 (3d Cir.1991) (citing *Federated Metals Corp. v. United Steelworkers,* 648 F.2d 856 (3d Cir.), *cert. denied sub nom.,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981)); *Seafarers Int'l Union of North Am. v. National Marine Servs., Inc.,* 820 F.2d 148, 152–54 (5th Cir.), *cert. denied,* 484 U.S. 953, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *Local Joint Executive Bd. of Las Vegas Culinary Workers Union, Local 226 v. Royal Center, Inc.,* 796 F.2d 1159 (9th Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 881, 93 L.Ed.2d 835 (1987). The Eighth and Tenth Circuits as well as the National Labor Relations Board, on the other hand, limited the *Nolde Bros.* presumption of post-expiration arbitrability to rights that accrued or vested under the agreement, or events that took place prior to expiration of the agreement. *See Chauffeurs, Teamsters & Helpers, Local Union 238 v. C.R.S.T. Inc.,* 795 F.2d 1400, 1404 (8th Cir.) (en banc), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986); *United Food & Commercial Workers Int'l Union, Local 7 v. Gold Star Sausage Co.,* 897 F.2d 1022, 1025–26 (10th Cir. 1990); *Indiana & Michigan Elec. Co.,* 284 N.L.R.B. 53 (1987). In yet another approach, the Seventh Circuit restricted application of *Nolde Bros.* to a limited period following expiration of the collective-bargaining agreement. *See Local 703, Int'l Bhd. of Teamsters v. Kennicott Bros. Co.,* 771 F.2d 300 (7th Cir.1985).

refused to submit to the contractual arbitration procedure.

In ruling that the grievance was not arbitrable under the expired agreement, the Supreme Court agreed with the NLRB and the courts which have interpreted *Nolde Bros.* as applying only where a dispute has "its real source" in the contract. *Id.* 501 U.S. at ——, 111 S.Ct. at 2225. The Court found that "*Nolde Bros.* does not announce a rule that post-expiration grievances concerning terms and conditions of employment remain arbitrable." *Id.* Rather, the Court held that the *Nolde Bros.* presumption is limited to disputes "arising under" the contract. *Id.* A post-expiration grievance "arises under" the contract only where: (1) "it involves facts and occurrences that arose before expiration," (2) "where an action taken after expiration infringes a right that accrued or vested under the agreement," or (3) "under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." *Id.*

In reaching this conclusion, the Court noted that any other interpretation of *Nolde Bros.* "fails to recognize that an expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Id.* Thus, the Court recognized that as a general rule, contractual obligations cease upon termination or expiration of the collective-bargaining agreement. Exceptions to this rule are determined by contract interpretation. Where rights have accrued or vested under the agreement or where the agreement provides "in explicit language" that certain benefits survive the agreement's termination or expiration, "disputes as to such continuing benefits may be found to arise under the agreement, and so become subject to the contract's arbitration provi-

sions." *Id.* at ——, 111 S.Ct. at 2226, (citing *United Steelworkers of Am. v. Fort Pitt Steel Casting, Div. of Conval–Penn, Inc.,* 598 F.2d 1273 (3d Cir.1979)).

■ *Nolde* and *Litton* taken together provide the rules of construction for determining whether an agreement to arbitrate contained in a collective-bargaining contract extends to disputes arising after the contract expires. Under these two cases, the parties are bound to arbitrate a dispute if the contract does not negate expressly or by clear implication the presumption favoring post-expiration arbitration of the dispute and if the dispute is over a right "arising under" the expired contract.

■ Luden's contends that because Article XVI is limited to employee grievances which involve "only him" it is much narrower than the arbitration clause in *Nolde Bros.*[18], and does not encompass "a general wage demand". (Pl.Mem. at 18–19). However, comparing the arbitration clause of the 1988 CBA with those in *Nolde Bros.* and *Litton*[19], we find that the broad scope of Article XVI "places it within the rationale of *Nolde Bros.*" *See Litton,* 501 U.S. at ——, 111 S.Ct. at 2225. The clause applies, without restriction, to any employee grievance. Furthermore, the Union, in its reply memorandum, asserts that the parties have ignored the individuality requirement in the past by filing "mass" grievances.

■ Luden's also asserts that by conditioning the duty to pay retroactive wages on the continuation of the prior agreement beyond its expiration date, the parties expressly excluded this dispute from the arbitration clause, thereby negating the *Nolde Bros.* presumption. We disagree. Our review of the Agreement and the parties conduct reveal nothing which excludes from arbitration post-termination claims involving the retroactive payment of negoti-

---

**18.** "All grievances shall be first taken up between the Plant Management and the Shop Steward." The Supreme Court found this clause to cover " 'any grievance' arising between the parties." *Nolde Bros.,* 430 U.S. at 245, 97 S.Ct. at 1068.

**19.** "Differences that may arise between the parties hereto regarding this Agreement and any alleged violations of the Agreement, the construction to be placed on any clause or clauses of the Agreement shall be determined by arbitration."
*Litton,* 501 U.S. at ——, 111 S.Ct. at 2219.

ated wage increases. Thus, we hold that the presumption favoring survival of the arbitration commitment has not been negated here. Accordingly, whether the present grievance is arbitrable turns on whether it "arises under" the expired agreement.

We turn now to the three-pronged *Litton* test to determine whether the retroactive wage dispute "arises under" the 1988 CBA and thus would be subject to arbitration [20].

### 1. *Facts or Occurrences*

From the stipulated facts it is clear that the facts and occurrences giving rise to the present dispute did not arise until well after the 1988 CBA's termination. Following Luden's May 3 letter terminating the 1988 CBA the parties met numerous times to negotiate a new agreement. Had the parties agreed to a new agreement prior to the 1988 CBA's termination, retroactive wages clearly would be due. Thus, it was the failure of the parties to agree to a new contract until after the Agreement's termination that gives rise to the present dispute. Therefore, no dispute existed until after the Agreement terminated. Accordingly, the first of *Litton's* three factors is not applicable to the retroactive wage dispute.

### 2. *Accrued or Vested Rights*

Under the second prong of *Litton*, the present dispute is subject to arbitration if the right to retroactive wages sought by the Union is a right that accrued or vested under the 1988 CBA. In *Litton*, the Court rejected the Union's argument that the rights created by the layoff provision vested or accrued during the term of the collective-bargaining agreement. Instead, the

Court found that these rights, unlike the right to severance pay at issue in *Nolde Bros.*, could not be construed as a form of deferred compensation. *Litton*, 501 U.S. at ——, 111 S.Ct. at 2227. Courts following the *Litton* decision have similarly found that the right to be discharged only for just cause did not vest or accrue under an expired collective-bargaining agreement. *International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Local Union 1199 v. Pepsi–Cola Gen. Bottlers*, 958 F.2d 1331, 1334 (6th Cir.1992); *Cadillac Indus., Inc. v. Amalgamated Clothing & Textile Workers Union*, 775 F.Supp. 30, 33 (D.C.Puerto Rico 1991).

The right to retroactive wages, like the layoff provision in *Litton* and the right to be discharged only for just cause, cannot be said to vest or accrue under the 1988 CBA. The test in deciding if benefits have accrued is whether they are due and payable on the date on which the employer denied them. *E.L. Wiegand Div. v. NLRB*, 650 F.2d 463, 469 (3d Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982). We interpret Article XXIX as providing for retroactive wages contingent upon the parties willingness to continue operation under all of the terms of the Agreement until a new agreement could be reached. Thus, this right could not accrue and the Union would not be entitled to retroactive wages unless a new collective-bargaining agreement was entered into prior to the termination of the 1988 CBA. Because the Agreement had been terminated prior to the Union's November 1 approval of a new agreement, retroactive wages were not due and payable. Furthermore, "an expired contract has by its own terms released all parties

---

**20.** The Union failed altogether to apply *Litton's* three-prong test to the facts of this case. Instead, the Union saw fit to argue, despite the Court's clear language that it granted certiorari "[b]ecause of substantial disagreement as to the proper application of our decision in *Nolde Bros.*" *Litton*, 501 U.S. at ——, 111 S.Ct. at 2221, that the Court's decision was somehow limited to "unique facts" and the "post and remote time frame which existed in Litton." (Union's October 19, 1992 Letter to the Court, pp. 3, 6). Significantly, however, in its Motion For Sum-

mary Judgment, the Union in discussing *Nolde Bros.*, repeatedly claimed that the right to retroactive wages "arises under" the 1988 CBA (Def. Mem. at 3), that Luden's obligation to pay retroactive wages "vested under the previous 1988" CBA (*Id.* at 12) and that the rights to retroactive wage payments "accrued under the terms of the 1988" CBA. (*Id.* at 14). Thus, the Union, while recognizing the importance of the "accrual" or "vesting" of the claimed rights, failed to inform this court how the right to retroactive wages vested or accrued under the 1988 CBA.

from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Litton,* 501 U.S. at ——, 111 S.Ct. at 2225. The right to retroactive wages is strictly a creature of the 1988 CBA. We find that by terminating the Agreement, Luden's avoided its obligation to pay retroactive wages prior to the vesting or accrual of that right.[21]

### 3. *Survival of Termination*

Finally, in applying the third prong of *Litton,* we conclude that, under the normal principles of contract interpretation, the retroactive wage right does not survive termination of the Agreement. In particular, the 1988 CBA does not provide in "explicit terms" that the retroactive wage provision survives the Agreement's termination. *Litton,* 501 U.S. at ——, 111 S.Ct. at 2226 (citing *United Steelworkers of Am. v. Fort Pitt Steel Casting Div. of Conval– Penn, Inc.,* 598 F.2d 1273, 1276 (3d Cir. 1979) (Agreement provided: "[t]he parties agree that in the event of a labor dispute at the end of termination of this Agreement, the Company will continue hospitalization and insurance benefits.")). Instead, by its express language the 1988 CBA was to remain in full force and effect beyond the stated expiration date and the wages of any new agreement would be retroactive, unless either party terminated the Agreement. Clearly, the duty to pay retroactive wages does not survive termination of the 1988 CBA, but was contingent upon a new agreement being entered prior to termi-

nation. Under no normal principle of contract interpretation could the Duration clause be read as requiring retroactive wages once the Agreement was terminated.

 We realize that in reaching this conclusion, we have interpreted the Duration clause of the Agreement. However, as previously noted, in the context of an expired collective-bargaining agreement the court must determine whether the parties intended to arbitrate the dispute, even if it requires the court to interpret a provision of the expired agreement. *Litton,* 501 U.S. at ——, 111 S.Ct. at 2227.[22]

### V. CONCLUSION

For the foregoing reasons, we conclude: (1) Luden's terminated the 1988 CBA; (2) nothing in the Agreement or the parties' conduct negates the *Nolde Bros.* presumption of arbitrability; but (3) the retroactive wage dispute does not fall within any of the three "arising under" standards of *Litton;* and therefore, (4) the intent of the parties was not to arbitrate this dispute. Accordingly, plaintiff's motions for summary judgment to enjoin arbitration is hereby granted, and defendant's motion for summary judgment to compel arbitration is hereby denied.

---

**21.** It is apparent from the structure of the Agreement that the parties did not view the retroactive wage provision as a form of "deferred compensation." This provision was placed in the Duration clause rather than in the Wage clause or the Vacation clause, which are traditionally considered to be rights which are compensation for work already performed. *See Teamsters Local Union 688 v. John J. Meier Co.,* 718 F.2d 286, 288–89 (8th Cir.1983).

**22.** We recognize that in application Luden's power to unilaterally terminate the 1988 CBA may render the Union's right to retroactive wages meaningless. That is, Luden's could at any time prior to signing a new collective-bargaining agreement simply terminate the prior CBA thereby defeating the Union's rights to collect retroactive wages under the prior agree-

ment. While on its face, this result may appear inequitable, we note that in dealing with the Union, Luden's is under a duty to act in good faith. *Cf. Litton Financial Printing Div. v. NLRB,* 501 U.S. ——, ——, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991) (Sections 8(a)(5) and 8(d) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and 158(d), require an employer to bargain in "good faith with respect to wages, hours, and other terms and conditions of employment."). Moreover, should the Union wish to avoid this harsh result in the future, it may negotiate with Luden's to make retroactive wages a prospective term of any new agreement or for a termination clause more carefully drafted to protect its right to retroactive wages under the expired agreement.