

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-16-1994

# Luden's, Inc. v. Local Union No. 6, Bakery, Confect'ry;Tobacco Wrkrs Internat'l

Precedential or Non-Precedential:

Docket 92-1982

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Luden's, Inc. v. Local Union No. 6, Bakery, Confect'ry;Tobacco Wrkrs Internat'l" (1994). *1994 Decisions.* Paper 51.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/51

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 92-1982

_____

LUDEN'S INC.,

<u>Appellee</u>

v.

LOCAL UNION NO. 6 OF THE BAKERY, CONFECTIONERY AND
TOBACCO WORKERS INTERNATIONAL UNION OF AMERICA;
AMERICAN ARBITRATION ASSOCIATION,

Bakery, Confectionery and Tobacco Worker's
International Local Union 6,

<u>Appellant</u>

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 92-01545)

_____

Argued:  June 24, 1993

Before: BECKER, ALITO, and ROTH, <u>Circuit Judges.</u>

(Filed  June 17, 1994)

BERNARD   N.   KATZ,   Esquire
(ARGUED)

LYNNE P. FOX, Esquire
Meranze and Katz
12th   Floor,   Lewis   Tower
Bldg.

Philadelphia, PA  19102

<u>Attorneys          for</u>
<u>Appellant</u>

(ARGUED)

DANA S. SCADUTO, Esquire

McNees, Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, PA  17108-1166

Attorney for Appellee

---

**OPINION OF THE COURT**

---

BECKER, <u>Circuit Judge</u>.

Luden's Inc. ("Luden's"), the manufacturer of a well-known brand of cough drops, among other products, commenced this action in the United States District Court for the Eastern District of Pennsylvania against Local Union No. 6 of the Bakery, Confectionery, and Tobacco Workers International Union of America (the "Union") and the American Arbitration Association ("AAA"). It sought a declaratory judgment and an injunction to prevent the Union from submitting to arbitration before AAA a dispute between Luden's and the Union concerning the retroactivity of wages under the terms of a lapsed collective bargaining agreement ("CBA").[0] The parties presented the district court with stipulated facts and documents, and then by agreement filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The district court granted Luden's motion and denied the Union's, thereupon permanently enjoining the scheduled arbitration proceedings. <u>See</u> <u>Luden's, Inc.</u> <u>v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers</u> <u>Int'l Union</u>, 805 F. Supp. 313, 327 (E.D. Pa. 1992).

The Union appealed. For the reasons that follow, we conclude that the parties' duty to arbitrate survived Luden's termination of their CBA effective July 3, 1992 as a term of an "implied-in-fact CBA" which was formed on that date. We will

---

[0]AAA did not actively participate in the disposition of the controversy on the merits, and agreed to be bound by its resolution. Stip. of Facts ¶¶ 32-33 & Exh. J.

therefore vacate the injunction entered by the district court, and will remand with instructions to direct the parties to proceed to arbitrate the retroactive wage grievance.

## I. FACTS AND PROCEDURAL HISTORY

The parties stipulated to all the relevant facts. Luden's, the plaintiff in the underlying action and the appellee here, owns and operates a manufacturing plant in Reading, PA. The Union represents some of Luden's employees at that plant. AAA, which has an office located in Philadelphia, provides, among other services, arbitrators to hear and resolve disputes arising out of the administration of CBAs.

On May 1, 1988, Luden's and the Union jointly executed a CBA (the "1988 CBA") governing the terms and conditions of employment for certain employees whom the Union represents at Luden's Reading plant. Stip. of Facts ¶ 1. Article XXIX of the agreement, the centerpiece of this litigation, was entitled "Duration of Agreement" and provided in its entirety:

> This Agreement shall be and remain in full force and effect for a period of three (3) years until and including April 29, 1991, and thereafter, until a new agreement, the wage clause of which shall be retroactive to the above given date, has been consummated and signed, or until this Agreement, upon sixty (60) days notice in writing, has been terminated by the Union with the sanction of the Bakery, Confectionery and Tobacco Workers' International Union of America or has been terminated by the Company.

Stip. of Facts, Exh. A. As will become apparent, the unartful and imprecise drafting of the retroactive wage clause is the <u>raison d'être</u> for this litigation.

4

Like most CBAs, the 1988 CBA incorporated a tiered grievance procedure in Article XVI to facilitate the amicable resolution of grievances arising between employees and management in the course of their intimate employment relationship.[0] The fifth and final step of that procedure permitted either party to submit unresolved grievances to final and binding arbitration; the parties were to select the arbitrator cooperatively from a short list provided by AAA. Stip. of Facts, Exh. A.

The 1988 CBA by its terms was scheduled to expire on or after April 29, 1991, the exact date being triggered by either sixty days notice of either party or the parties' joint execution of a replacement CBA. In a letter dated February 14, 1991, the Union by its President Joseph Rauscher provided Luden's Plant Manager

---

[0]Article XVI, entitled "Settlement of Grievances and Arbitration," provided in pertinent part:

> Step I. Any employee who believes that he has a grievance which involves only him shall discuss the grievance with his or her Department Supervisor within three, (3), days of the time the alleged grievance became known to the employee.
> . . .
> Step V. Where the parties have been unable to reach a mutually satisfactory resolution of the grievance at Step IV, either party may request the American Arbitration Association to submit a list of arbitrators for the consideration of the parties. Thereafter, the matter, unless settled, shall be processed [through] arbitration in accordance with the rules and procedures of the AAA.
> The decision of the Arbitrator shall be final and binding upon the parties, provided, however, the Arbitrator shall have no authority to alter, amend or modify the terms and conditions of the collective bargaining agreement or to substitute his judgment for that of the parties or either of them with respect to any matter he is not expressly authorized to resolve whether by the terms of the Agreement or by mutual request of the parties.

Stip. of Facts, Exh. A.

5

Donald B. Watson with the required sixty days notice that the Union intended to "change, modify or terminate" the 1988 CBA (pursuant to Article XXIX thereof). Stip. of Facts ¶ 2 & Exh. B. The letter included a "Notice to Mediation Agencies," signed by the Union's President, designating April 29, 1991 as the contract termination date. Id. Soon thereafter, on March 11, 1991, the parties began negotiations on a new CBA. Of the fifteen separate negotiating sessions the parties eventually met for, nine took place prior to the arranged April 29, 1991 termination date for the 1988 CBA. Stip. of Facts ¶ 3. At the last of the pre-April 29 meetings, Luden's extended three separate written contract offers. The Union rejected each of these offers but verbally proposed counteroffers, each of which, in turn, Luden's rejected. None of these offers or counteroffers clarified the issue of the retroactive application of the new wage clause according to the terms of Article XXIX. Stip. of Facts ¶ 4 & Exhs. C-E.

By memorandum dated April 29, 1991, Luden's Plant Manager Donald B. Watson advised Union employees of the general status of contract negotiations, and specifically reported that Luden's and the Union had "agreed to disregard the deadline of April [29] and [to] continue operating under the terms of the current contracts." Stip. of Facts ¶ 5 & Exh. F. A few days later, however, in a letter dated May 3, 1991, Luden's disclosed a changed strategy. On that occasion, Watson notified the Union's business representative Francis Ryan that Luden's wished to terminate the 1988 CBA "effective 12:01 a.m. Monday, May 13, 1991" (about ten days later). In addition, the letter contained both a "comprehensive

6

offer" for a new CBA and an attempt by Luden's to condition its payment of wages according to the new wage scale retroactively to April 29, 1991 on the Union's timely acceptance of the enclosed proposal. Stip. of Facts ¶ 6 & Exh. G. The Union's negotiating committee promptly rejected Watson's offer. Stip. of Facts ¶ 7.

Over the course of the next few months, the parties continued their negotiations, each submitting various offers or counteroffers. Stip. of Facts ¶¶ 8, 10. During this time Luden's sent or distributed several letters directly to its employees to familiarize them with its bargaining position and to entreat them to accept its contract offers at their Union's contract ratification meetings.[0] Stip. of Facts ¶ 11 & Exh. O. Each of these letters reported that Luden's would pay retroactive wages to April 29, 1991 if the Union and its membership accepted Luden's offer in its entirety.[0] Despite Luden's efforts, though, the membership rejected

---

[0]The Union, distressed over the letters Luden's sent to its employees, filed concurrently with the ongoing negotiations an unfair labor charge against Luden's with the National Labor Relations Board ("NLRB"), which charge it later amended. Stip. of Facts ¶ 13, 14. The amended charge accused Luden's both of "violat[ing] its obligation to bargain in good faith by both threatening improper actions and by undermining and bypassing the bargaining representatives of the employees" and also of engaging in "surface bargaining behavior by having preconceived inflexible positions," but did not bring the disagreement over the meaning of the retroactive wage clause before the Board. Stip. of Facts, Exhs. K, L. The Regional Director of the NLRB, Peter Hirsch, rejected the Union's contentions on August 20, 1991 and declined to issue a complaint. Stip. of Facts ¶ 15 & Exh. M. On October 18, 1991 the NLRB's General Counsel denied the Union's appeal from that decision. Stip. of Facts ¶¶ 16, 17 & Exh. P. For a more thorough discussion of these collateral proceedings, see 805 F. Supp. at 317-18.

[0]The relevant portions of the letters to the Union and/or members stated:

> I have enclosed a comprehensive offer . . . . Should it be accepted we will pay retroactive wages to Monday April 29, 1991.

7

each of the Luden's offers which the Union submitted to it for approval (specifically, the offers of May 16 and June 20, 1991). Stip. of Facts ¶¶ 9, 12.

On November 1, 1991, during a negotiation session, Luden's proposed what was, from the Union's perspective, a superior agreement, but one which was silent with respect to the retroactivity of wages. Stip. of Facts ¶ 18 & Exh. Q. The following day the Union submitted certain terms and conditions of that proposal to its membership, tallying a vote in favor of approval. Stip. of Facts ¶ 19. Luden's thereafter posted a notice enumerating the terms it thought comprised the proposal that the Union membership had ratified and also undertook to memorialize the agreement by drafting a document reflecting its understanding of the terms of the membership's vote. Stip. of Facts ¶ 21.

-------

Stip. of Facts, Exh. G (Letter from Watson, Luden's Plant Manager, to Ryan, Union's Business Representative (May 3, 1991)).

> Wages will be paid retroactive to April 29, 1991 should this entire package be accepted by Mon. evening May 20, 1991.

Stip. of Facts, Exh. H (Offer by Luden's to the Union (May 16, 1991)).

> Wages will be paid retroactive to April 29 should this package be accepted by the membership.

Stip. of Facts, Exh. I (Offer by Luden's to the Union (June 20, 1991)).

> Wages will be paid retroactive to April 29, 1991, should you accept revised language for Article XXIX . . . .

Stip. of Facts, Exh. J (Letter from Watson, Luden's Plant Manager, to Luden's Employees (July 15, 1991)).

8

Luden's posted notice and its written proposal both indicated an effective date of November 4, 1991 for the new wage scale. The Union dissented from this aspect of the writings, and took the position that the retroactivity provision of the old Article XXIX mandated retroactive application of the new pay scale to May 1, 1991. Stip. of Facts ¶ 22 & Exhs. R, S, T. Faced with this major disagreement between the parties, the Union on January 17, 1992 invoked the grievance procedure of the 1988 CBA (quoted supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**) and requested AAA to provide a list of arbitrators to resolve the conflict over the retroactivity provision of Article XXIX. Stip. of Facts ¶ 24. AAA reserved September 15 and 16, 1992 for the arbitration of the dispute. Stip. of Facts ¶ 25.

On March 6, 1992, Luden's initiated the instant action against the Union and AAA, seeking a declaratory judgment that the dispute between the parties regarding the retroactivity of wages under the "lapsed" 1988 CBA was not arbitrable.[0] Moreover, Luden's prayed for an injunction against the arbitration proceeding which the Union had scheduled with AAA. Stip. of Facts ¶¶ 24-25. The parties submitted stipulated facts and documents to the district court and agreed to submit the issues for resolution upon cross-motions for summary judgment based solely and exclusively thereon. Stip. of Facts ¶¶ 29-31. After ordering the parties to supply supplemental motions addressing the intervening decision in Litton Financial Printing Division v. NLRB, 501 U.S. 190, 111 S. Ct. 2215

---

[0] Luden's places a great deal of stock in what it regards as the consequential distinction between an expired and a terminated CBA. To avoid confusion on this issue, we will utilize "lapsed" herein to denote either an expired or a terminated CBA.

(1991), the district court granted Luden's motion and denied the Union's. See 805 F. Supp. at 315 n.1, 327. In granting the relief requested by Luden's, the district court permanently enjoined the arbitration slated for mid September. As of the date of oral argument before this Court, their minds had not yet met, and the plant operated without a signed CBA. Stip. of Facts ¶ 23.

## II. THE DISTRICT COURT'S DECISION AND THE ISSUES ON APPEAL

In resolving the summary judgment motions, the district court reached a number of conclusions which neither party challenges on appeal. The district court subdivided its analysis into two sections, first considering the issue of the termination of the 1988 CBA and only then addressing the arbitrability of the post-termination dispute. In the first section of its opinion, the district court concluded that it, not an arbitrator, was to decide the issue of the arbitrability of the dispute;[0] that either party could unilaterally terminate the 1988 CBA according to Article XXIX thereof on or after April 29, 1991 with sixty days notice; that, because of the parties' subsequent arrangement to continue honoring the 1988 CBA, the Union's letter of February 14, 1991 did not actually terminate the Agreement; that Luden's May 3, 1991 letter (which specified May 13, 1991 as Luden's intended termination date) operated to terminate the Agreement, but not until sixty days after its receipt (on July 2, 1991); and that the Agreement's arbitration clause (Article XVI) was inclusive enough to encompass grievances

---

[0]See A T & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S. Ct. 1415, 1418 (1986) (holding that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator").

10

over the application of the retroactivity provision of Article XXIX. See 805 F. Supp. at 320-25.

We do not pass judgment on these rulings and, for purposes of this appeal, treat them as correct in all respects. Although the Union in its brief approaches the issue from several discrete angles, in substance it challenges on appeal only the second half of the district court's decision. In that portion of its opinion, the court held that the construction and effect of the retroactive wage provision of the 1988 CBA was not subject to arbitration because, by the time the parties settled on a tentative new agreement, there was no longer an arbitration provision in effect between the parties. See 805 F. Supp. at 323-27.

In reaching this conclusion, the district court read Litton and Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 97 S. Ct. 1067, reh'g denied, 430 U.S. 988, 97 S. Ct. 1689 (1977) to hold that it could order the parties to arbitrate their post-termination dispute only if it first determined that the dispute arose under the CBA. 805 F. Supp. at 326. The court then construed the 1988 CBA to determine whether under the three-prong test announced by Litton the instant dispute arose under that agreement.[0] See infra at **Error! Bookmark**

---

[0]The district court apparently did not consider why Luden's was not obliged to arbitrate the retroactivity question at least with respect to wages earned before July 2, 1991, the effective termination date of the 1988 CBA. See 805 F. Supp. at 326-27. We can speculate that, having already concluded, in the course of construing the 1988 CBA to determine if it should order arbitration for the period after July 2, 1991, that the retroactivity clause was never activated (a conclusion upon which we decline to pass judgment), the court perhaps reasoned that it would be pointless to send the same issues to an arbitrator, since the Union might have been collaterally estopped from advocating a different contruction of the relevant provision. Of course, since we will vacate the court's

**not defined**. n.**Error! Bookmark not defined.**.. Conscious of the fact that in the process of applying the Litton test it had construed the provisions of the 1988 CBA, the court justified its approach by reference to Litton, which had instructed courts to determine "whether the parties intended to arbitrate the dispute, even if it requires the court to interpret a provision of the expired agreement." Id. at 327 (citing Litton, 111 S. Ct. at 2227). The court, at bottom, held that Luden's did not have to arbitrate the dispute.

The district court exercised jurisdiction over the claim brought under the Declaratory Judgment Act, see 28 U.S.C.A. §§ 2201-02 (1982 & Supp. 1993), pursuant to § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C.A. § 185(a) (1978), which grants district courts jurisdiction over suits to enforce the terms of CBAs. See Mack Trucks, Inc. v. International Union, UAW, 856 F.2d 579, 583-90 (3d Cir. 1988), cert. denied, 489 U.S. 1054, 109 S. Ct. 1316 (1989); Huettig & Schromm, Inc. v. Landscape Contractors Council, 790 F.2d 1421, 1425-26 (9th Cir. 1986). We have jurisdiction over an appeal from a final judgment of a United States district court. See 28 U.S.C.A. § 1291 (1993).

We exercise plenary review over a district court's grant of summary judgment. See Wheeler v. Towanda Area Sch. Dist., 950 F.2d 128, 129 (3d Cir. 1991). In doing so, we employ the same test the district court initially should have employed. See Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir. 1990), cert. denied, 498 U.S. 1109, 111 S. Ct. 1018

judgment, collateral estoppel will not bar the arbitrator from reconsidering afresh the district court's ruling.

(1991).  Since the parties stipulated to all material facts, we need not concern ourselves with conflicting affidavits; nonetheless, where we must draw inferences from the stipulated facts, we still must resolve them against the moving party and in favor of the nonmoving party.  See Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S. Ct. 732 (1977); Erie Telecommunications, Inc. v. City of Erie, Pa., 853 F.2d 1084, 1093 (3d Cir. 1988).

III.  THE PARTIES' DUTY TO ARBITRATE ISSUES UNDER A LAPSED CBA

A.  Introduction

Resolution of this appeal within the framework of the parties' initial briefs would have required us to modulate Nolde and Litton, two Supreme Court decisions which are in tension and which therefore breed uncertainty in the sphere of labor law.  In Nolde the Supreme Court held that courts are not to reach the merits of the dispute, but instead are to order arbitration if the lapsed CBA arguably creates the obligation at the center of the grievance.[0]

---

[0]See Nolde, 430 U.S. at 249, 97 S. Ct. at 1071 ("Of course, in determining the arbitrability of the dispute, the merits of the underlying claim for severance pay are not before us." (emphasis supplied)); AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649–50, 106 S. Ct. 1415, 1419 (1986) (holding that "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims" (emphasis supplied)); cf. United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–83, 80 S. Ct. 1347, 1353 (1960), quoted infra at 28; United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S. Ct. 1358, 1360 (1960) ("The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements."); United Steelworkers v. American Mfg. Co., 363 U.S. 564, 568, 80 S. Ct. 1343, 1346 (1960) ("The courts . . . have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or

13

In particular, the Court held that the need to construe the lapsed agreement to determine if the grievance has merit -- even if the necessary interpretation involves answering the query whether the asserted right vested under the CBA or survived its termination -- is enough to require arbitration.  See Nolde, 430 U.S. at 249-52, 97 S. Ct. at 1071-72.

The problem is that Litton is at odds with Nolde in terms of the court's duty to reach the merits of a dispute relating to a lapsed CBA on the one hand, and Litton's disavowal that it was overruling Nolde on the other hand.  See Litton, 111 S. Ct. at 2219, 2225; id. at 2228-29 (Marshall, J., dissenting); id. at 2232 (Stevens, J., dissenting); John F. Corcoran, Note, The Arbitrability of Labor Grievances that Arise After the Expiration of the Collective Bargaining Agreement, 43 Syracuse L. Rev. 1073, 1085 & n.87 (1992) [hereinafter Arbitrability of Labor Grievances].  In contradistinction to Nolde, Litton held that a court has the duty to reach the merits of the claim, and can order arbitration only if it concludes that the lapsed CBA in fact creates the right or obligation at issue.  See Litton, 111 S. Ct. at 2227.[0]

As far as we can tell, other courts have uniformly resolved this tension by reading Litton as having impliedly

determining whether there is particular language in the written instrument which will support the claim." (footnote omitted)).
[0]The Court, moreover, took this prescription quite seriously, for, as Justice Marshall pointed out in his dissent, it was debatable whether the obligation at issue in Litton arose under the expired CBA or not.  Compare Litton, 111 S. Ct. at 2227 (construing the qualified seniority provision as not having vested) with id. at 2230-31 (Marshall, J., dissenting) (contra) and Corcoran, Arbitrability of Labor Grievances, supra, 43 Syracuse L. Rev. at 1086-88 (agreeing with Justice Marshall's dissent).  Cf. Litton, 111 S. Ct. at 2232 (Stevens, J., dissenting) (declining to address the merits of the dispute).

overruled the portion of Nolde holding that a court answering the arbitrability question is not to look to the merits of the underlying claim.[0]  Being reluctant to follow their course, and having conscientiously reviewed this case after oral argument, we requested the parties to file supplemental memoranda setting forth their views as to whether, under the federal common law of CBAs, this Court should recognize an implied-in-fact CBA which arose by virtue of the parties' conduct after the lapse of the 1988 CBA.[0]  If we were to do so, we would not need to confront the tension between Nolde and Litton, since the duty to arbitrate would stem from the implied-in-fact CBA (albeit derived in part from the lapsed CBA) rather than directly from the lapsed contract, and the question whether the right at issue accrued, if at all, under the lapsed contract or during the interim period before Luden's implementation of the November 4, 1991 near "agreement" would be mooted.  Because we conclude that Luden's contractual duty to arbitrate grievances never lapsed completely, this avenue provides the route whereby we

---

[0]See Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Net., Inc., 17 F.3d 906, 910-11 (6th Cir. 1994); International Bhd. of Teamsters, Local Union 1199 v. Pepsi-Cola Gen. Bottlers, Inc., 958 F.2d 1331, 1333-34 (6th Cir. 1992); Cumberland Typographical Union No. 244 v. Times & Alleganian Co., 943 F.2d 401, 404-05 (4th Cir. 1991); Winery, Distillery & Allied Workers, Local 186 v. Guild Wineries & Distilleries, 812 F. Supp. 1035, 1037-38 (N.D. Cal. 1993); Amalgamated Clothing Workers Union v. Stanbury Uniforms, Inc., 811 F. Supp. 464, 467-69 (E.D. Mo. 1992); New York Newspaper Printing Pressmen's Union No. 2 v. New York Times Co., No. 91-Civ.-5937, 1991 WL 206290, at *2-*3 (S.D.N.Y. Oct. 2, 1991), aff'd, 953 F.2d 635 (2d Cir. 1991); cf. Independent Lift Truck Builders Union v. Hyster Co., 2 F.3d 233, 236-37 (7th Cir. 1993) (concluding that "the rule that courts must decide the arbitrators' jurisdiction takes precedence over the rule that courts are not to decide the merits of the underlying dispute").
[0]Both parties fully briefed the question of law presented, and neither party requested to supplement the stipulated facts for purposes of their cross-motions for summary judgment.

15

may avoid addressing the uncertain interplay between Nolde and Litton, though we express hope that the Supreme Court will take on that challenge itself.

B.  Implied-in-Fact Contracts and Their Application to Lapsed Collective Bargaining Agreements

To settle the question whether the duty to arbitrate arose as a term of an implied-in-fact CBA between Luden's and the Union in light of the facts before us, we need to consult the federal common law of CBAs.  Section 301 of the LMRA, as Litton stated, "authorizes federal courts to fashion a body of federal law for the enforcement of [CBAs]."  111 S. Ct. at 2223 (quoting Textile Workers Union v. Lincoln Mills of Ala., 353 U.S. 448, 451, 77 S. Ct. 912, 915 (1957)) (emphasis and internal quotation omitted).  As to the substantive content of this federal common law, traditional rules of contract interpretation provide a plenteous resource, but will be mined only when compatible with federal labor policy.  See Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 102-04, 82 S. Ct. 571, 576-77 (1962); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 548, 84 S. Ct. 909, 914 (1964) ("State law may be utilized so far as it is of aid in the development of correct principles or their application in a particular case, but the law which ultimately results is federal." (citation omitted)); Mack Trucks, 856 F.2d at 591-92 (holding that we look to "federal labor relations law, not state contract law," to ascertain if a contract has formed, as "[i]n the field of labor relations, the technical rules of contract law do not determine the existence of an agreement").  Implied-in-fact CBAs encompassing arbitration clauses, then, will have their surest

16

footing if both "ordinary" contract law and federal labor policy sanction them.[0]

General contract law recognizes and enforces "implied-in-fact" contracts. Section 4 of the Restatement (Second) of Contracts, which employs the rubric "inferred from fact" to discuss that brand of contract, provides that "[a] promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct." Cf. REST.2D CONTRACTS § 19(1) (1981) ("The manifestation of assent may be made wholly or partly . . . by . . . acts or by failure to act."). Comment a to that section explains:

> Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance.

REST.2D CONTRACTS § 4 cmt. a (1981). Professor Corbin, whose treatise ventures nearer the precise issue we confront, writes that "if the parties at the expiration of a written contract of employment,

---

[0]Of course, an implied-in-fact CBA suffices to confer jurisdiction under § 301 because it preserves and advances the statutory objectives of labor peace and stability. See, e.g., International Bhd. of Boilermakers -- Local 1603 v. Transue & Williams Corp., 879 F.2d 1388, 1392 (6th Cir. 1989) (holding that jurisdiction under § 301 does not require an actual written CBA because the Supreme Court has broadly interpreted "`contract' to include any `agreement between employers and labor organizations significant to the maintenance of labor peace between them'" (quoting Retail Clerks Int'l Ass'n, Local Unions Nos. 128 & 633 v. Lion Dry Goods, 369 U.S. 17, 28, 82 S. Ct. 541, 548 (1962))); United Paperworkers Int'l Union v. International Paper Co., 920 F.2d 852, 859 (11th Cir. 1991) (same); Smith v. Kerrville Bus Co., 709 F.2d 914, 920 (5th Cir. 1983) (holding that §301 "must be broadly construed to encompass any agreement, written or unwritten, formal or informal, which functions to preserve harmonious relations between labor and management"), appeal after remand, 799 F.2d 1079 (5th Cir. 1986); cf. Garrett R.R. Car & Equip., Inc. v. NLRB, 683 F.2d 731, 737 (3d Cir. 1982).

continue as before without a new express agreement, it will be inferred that the service and the compensation are the same as before."  2 CORBIN ON CONTRACTS § 504, at 717 (1963).  Other treatises issue comparable pronouncements.[0]

Thus general principles of contract law teach us that when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby, or both parties mutually intend that the terms not survive. The rationale for this rule is straightforward:  when parties to an ongoing, voluntary, contractual relationship, especially a relationship which by its nature generally implies that some mutually agreed upon rules govern its configuration, continue to behave as before upon the lapse of the contract, barring contrary indications, each party may generally reasonably expect that the

---

[0] See 2 WILLISTON ON CONTRACTS § 6.42, at 452 (4th ed. Lord ed. 1990) ("When a contract of employment for a definite time has been made, and the employee's services are continued after the expiration of the definite time without objection, the inference is ordinarily that the parties have assented to another contract for a term of the same length with the same salary and conditions of service . . . ."); CHARLES G. BAKALY, JR. & JOEL M. GROSSMAN, MODERN LAW OF EMPLOYMENT CONTRACTS §§3.1.1, 3.1.4 (1985 Supp.) ("In the employment context, an implied offer may arise when an employer has previously retained an employee.  The employer may ask the former employee to perform a new job without mentioning that the employee will receive compensation for it. . . . If a reasonable person would have inferred from the employer's request that he intended to pay for the services, then the employer's request will be deemed an offer.") ("[A]cceptance need not always be formal or explicit, but may be implied from the circumstances.  For instance, an employee may accept an offer of employment merely by showing up for work, even if he has never formally notified the employer of his acceptance."); see also 1 WILLISTON ON CONTRACTS §§ 1:6, 4:2, 4:20; 2 id. §6:42.

lapsed agreement's terms remain the ones by which the other party will abide.

While this rationale loses some of its cogency in situations where the contract lapses because one party terminates it (rather than because the contract expires of its own force), it does retain most of its persuasiveness because the party's motive for terminating the contract in a continuing relationship will often be to change just a few of its terms. In the present context of labor arbitration clauses, for example, we think that a party's termination of a CBA generally does not signify that the party wishes to abandon arbitration in the future, for the parties' "interest in obtaining a prompt and inexpensive resolution of their disputes by an expert tribunal," <u>Nolde</u>, 430 U.S. at 254, 97 S. Ct. at 1073, does not dissipate the moment the contract lapses.[0] Indeed, although we have not been made privy either to the Union's or to Luden's motives in moving to terminate the 1988 CBA, neither evidence nor reason suggests that discontent with the arbitration procedure was a contributing factor.

Consistent with that observation is the fact that neither party clearly notified the other -- whether by an express[0] or

[0]We say "generally" because the events leading up to the termination of a CBA may reveal clearly to the other party that the terminating party is fed up with the arbitration provision and that this dissatisfaction is the basis for its termination or otherwise clearly transmit an intent to be rid of the arbitration provision. In context of this opinion, clear cases of implicit repudiation normally fall within the domain of what we denote as disavowals or repudiations.

[0]On this basis it is apparent that, even if the retroactive wage provision were subject to inclusion in an implied-in-fact CBA, it would not be encompassed by the implied-in-fact CBA which arose between Luden's and the Union. Luden's in its May 3, 1991 letter to the Union specifically explained that, if the Union rejected its comprehensive offer (which the Union proceeded to do), Luden's would

clearly implicit disavowal, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**, or by clearly incompatible conduct, see infra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.** -- that it was unilaterally revoking or repudiating the arbitration provision so well established between the parties. Cf. International Bhd. of Boilermakers -- Local 1603 v. Transue & Williams Corp., 879 F.2d 1388, 1390, 1393 (6th Cir. 1989) (emphasizing that the employer did not explicitly inform the union it wished "to revoke the parties' agreement as to the grievance procedures" and that there was "no evidence to indicate a dispute over the terms of the grievance and arbitration provisions" before finding an implied-in-fact contract arose after expiration of the parties' CBA); United Paperworkers Int'l Union Local No. 200 v. Wells Badger Indus., Inc., 835 F.2d 701, 702-04 (7th Cir. 1987) (same). In fact, Luden's November 7, 1992 memorialization of the parties' near "agreement" contains a grievance and arbitration procedure virtually identical to the one the 1988 CBA contained. In short, the record does not reveal that the parties disagreed about the continuation of the arbitration procedure during the interim bargaining period in any meaningful way or that both parties

---

make "no retroactive payments." Letter from Donald P. Watson, Plant Manger, to Frances Ryan, Business Representative (May 3, 1991). While we do not consider the effect of this statement on Luden's obligation to pay retroactive wages, it being an issue reserved for an arbitrator to rule on, we think the letter clearly and expressly evinces Luden's intention not to be bound by that clause in the implied-in-fact CBA.

We briefly note, too, that Luden's letter went on to state that, even if the Union rejected its offer, "we agree to continue normal operations," id., a fact which in a case (unlike this one) presenting conflicting evidence of the parties' intent would be of relevance to the survival of the arbitration clause in an implied-in-fact CBA.

20

actually intended for the arbitration clause not to endure, the occurrence of either of which would have excluded that term from the implied-in-fact CBA, but instead indicates that Luden's kept the doors to its business open, invited its employees to enter, and conducted business as usual.

In context of these facts, we think that the Union's membership was working under the reasonable presumption that it was entitled to arbitrate grievances rather than be forced to turn to the less efficient and more expensive mechanism of litigating them. The employer's uninterrupted fidelity to the arbitration provision stood as the implied consideration for the employees' continued diligent and loyal service. Even had Luden's entertained a subjective desire to end its obligation to arbitrate grievances, since the record does not show the Union to have shared that desire, the objective terms of the implied-in-fact CBA controlling the parties' relationship would not have changed. See Mack Trucks, 856 F.2d at 592 ("The parties' objective intent to create a contract is relevant -- not their subjective beliefs."). Had Luden's demonstrably disavowed that provision, the union employees could have consciously chosen whether or not to continue working diligently for their employer (that is, they could have elected, based on their employer's decision to refuse arbitration, whether to quit, strike, engage in a boycott, work slow-down, or work stoppage, or to continue to execute their job responsibilities faithfully).⁰ But Luden's did not do so, and its employees were thus

⁰We cannot provide a recipe for conduct which suffices to preclude the formation or annul the existence of an implied-in-fact arbitration provision, and leave that question for later devel-opment. We can provide some guidance now, though. Since the

deprived of the potential to make an informed choice. Throughout the relevant period, Luden's reaped benefits from its union employees' loyal service, and now it must accept the consequences.[0]

---

peaceful continuation of the contractual relationship is the linch-pin of our decision, we note that resort to ultimate economic weapons (either a lock-out or a strike) would usually manifest an intent to repudiate the arbitration provision of the implied-in-fact CBA. Needless to say, the quid pro quo for arbitration clauses is typically a promise not to strike or lock-out. See United Steelworkers v. American Mfg. Co., 363 U.S. 564, 567, 80 S. Ct. 1343, 1346 (1960) (stating that a no-strike clause is the quid pro quo for a grievance clause); Indiana & Mich. Elec. Co., 284 N.L.R.B. 53, 58 (1987) ("an agreement to arbitrate is a product of the parties' mutual consent to relinquish economic weapons, such as strikes or lockouts, otherwise available under the [National Labor Relations] Act to resolve disputes"); Hilton-Davis Chem. Co., 185 N.L.R.B. 241, 242 (1970) (same); cf. International Bhd. of Teamsters, Local Union 1199 v. Pepsi-Cola Gen. Bottlers, Inc., 958 F.2d 1331, 1335 (6th Cir. 1992) (holding that while "[t]he existence of a labor contract may be shown by conduct manifesting an intention to abide by agreed-upon terms," the fact that the union called a strike after the employer implemented its final pre-impasse offer "demonstrates that [the union] did not believe that an implied agreement incorporating all the undisputed terms of the old [CBA] existed"); International Union, United Mine Workers v. Big Horn Coal Co., 916 F.2d 1499, 1502 (10th Cir. 1990) (holding that the union's strike after the employer instituted its final offer showed an implicit "rejection of the employer's offer"), cert. denied, 112 S. Ct. 1172 (1992); Transue & Williams Corp., 879 F.2d at 1394 (highlighting the fact that "[a]t all relevant times [after the expiration of the CBA], the parties refused to marshal economic weapons and adhered to the grievance and arbitration provisions of their contract"). Accordingly, such conduct would probably send a clear message that the acting party no longer wishes to be bound by an implied-in-fact arbitration provision. Cf. Carpenters S. Cal. Admin. Corp. v. J.L.M. Constr. Co., 809 F.2d 594, 598 (9th Cir. 1987) ("[A]n employer can repudiate [an agreement] . . . by engaging in conduct so overtly inconsistent with contractual obligations that it is sufficient to put the union on notice of the employer's intent to repudiate."), vacated and reh'g granted, 840 F.2d 723 (9th Cir. 1988), vacated as moot, 872 F.2d 930 (9th Cir. 1989).

[0]Luden's asserts that its May 3, 1991 letter "constituted an `express indication' of its intention to abrogate all contractual terms." Suppl. Br. of Appellee at 16. We are unpersuaded, however, not only because the contractual employment relationship continued, but because we do not believe that Luden's genuinely wished to abrogate, for example, its employee's obligations to clean and maintain their uniforms, to work specified shifts, or to notify security of

Having looked only to ordinary principles of contract interpretation, we are inclined at this juncture to recognize an implied-in-fact CBA incorporating the arbitration provision from a lapsed CBA. We cannot do so, however, unless an implied-in-fact CBA incorporating a duty to arbitrate is also compatible with federal labor policy. We think that it is.

As a general matter, implied-in-fact CBAs are compatible with federal labor law and advance the goals of federal labor policy. We have intimated that an employer and a union may adopt an enforceable labor contract without reducing the agreement to writing, and that what really is crucial is "conduct manifesting an intent to be bound by agreed-upon terms." Mack Trucks, 856 F.2d at 592; cf. John Wiley & Sons, 376 U.S. at 551, 84 S. Ct. at 915. In this result we find ourselves sharing company with many courts of appeals who have concluded that a union may (impliedly) accept a

---

tardinesses or absences, or the Union's obligation to submit copies of notices to it for inspection before posting them on the company bulletin board, all of which were part of the 1988 CBA. Indeed, for all we can tell, Luden's expected its employees to continue abiding by the gamut of rules of employment which Luden's had imposed prior to its termination of the 1988 CBA. It is precisely the ambiguity and unfairness resulting from a selective and sub rosa continuation of only those contractual arrangements which in hindsight are beneficial to one party, a selectivity which will consistently breed discontent and disharmony, that the implied-in-fact contract theory helps eject from the labor arena.

This discussion sheds some light on a critical dissimilarity between arbitration provisions and many other terms of agreement between parties to a CBA. For many terms and conditions of employment, it is patently obvious if either party elects to reject it. For example, had the employees been dissatisfied with their obligation to wear uniforms, they would have shown up for work in regular street clothes, and Luden's would immediately have known of its employees' intent not to abide by that expired condition of employment. Not so with an arbitration provision, whose subjective unilateral rejection will not be apparent until a dispute erupts unless either party clearly and objectively expresses or indicates its views on the matter.

"unilateral offer" made when an employer implements its final offer after reaching a bargaining impasse by the ordinary act of entering the employer's open doors, a view with which we now concur.[o]

[o]See Cumberland Typographical Union No. 244 v. Times & Alleganian Co., 943 F.2d 401, 405 (4th Cir. 1991); United Paperworkers Int'l Union v. International Paper Co., 920 F.2d 852, 854, 855, 858 (11th Cir. 1991); International Union, United Mine Workers v. Big Horn Coal Co., 916 F.2d 1499, 1502 (10th Cir. 1990), cert. denied, 112 S. Ct. 1172 (1992); Transue & Williams Corp., 879 F.2d at 1393, 1392; Bobbie Brooks, Inc. v. International Ladies' Garment Workers Union, 835 F.2d 1164, 1168 (6th Cir. 1984); United Paperworkers Int'l Union, 835 F.2d at 704; Capitol–Husting Co. v. NLRB, 671 F.2d 237, 243 (7th Cir. 1982); Maxwell Macmillan Co. v. District 65, UAW, 790 F. Supp. 484, 485–86 (S.D.N.Y. 1992); cf. Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 935 F.2d 1501, 1510 (7th Cir. 1991) (contrasting the view that an employer's unilateral implementation of its final offer cannot give rise to a contract because the offer is "unilateral; the whole point is that the employer is implementing an offer that the union has not accepted" with the view that "the union might accept the offer, arbitration clause and all, by conduct rather than by express words," but refusing to pick sides (emphasis in original)); Chauffeurs, Teamsters & Helpers, Local Union 238 v. C.R.S.T., Inc., 795 F.2d 1400, 1402, 1404 (8th Cir. 1986) (en banc) (holding that an employer's past refusal to arbitrate grievances under unilaterally instituted terms and conditions of employment as well as its implementation of a new grievance procedure limited to only one specific type of dispute manifested an objective intent by the employer not to be bound by the expired agreement's arbitration provision), cert. denied, 479 U.S. 1007, 107 S. Ct. 647 (1986); Taft Broadcasting Co., WDAF AM–FM–TV v. NLRB, 441 F.2d 1382, 1384–85 (8th Cir. 1971) (holding that a letter by the employer telling the union it would comply with a draft agreement gave rise to an interim agreement to abide by the draft agreement when the union continued to work); see also Intermountain Rural Elec. Ass'n v. NLRB, 984 F.2d 1562, 1568 (10th Cir. 1993) ("[A]n uninterrupted and accepted custom [established during the life-span of an expired CBA] may become an implied term and condition of employment by mutual consent of the parties. Once an implied term is established, a unilateral change regarding the term is unlawful." (citation omitted)); Franklin Elec. Co. v. International Union, UAW, 886 F.2d 188, 192 (8th Cir. 1989) (holding in context of an employer's voluntary submission to an arbitrator for the arbitrator to decide the arbitrability of a dispute that "[c]onsent to arbitrate may be implied from the parties' conduct"); Smith v. Kerrville Bus Co., 709 F.2d 914, 920 (5th Cir. 1983) (holding that an employees' manual may become an implied term of a CBA if accepted by both parties and "significant to the maintenance of labor peace"); 1 WILLISTON ON CONTRACTS § 4:20, at 473–75 (4th ed.

Similarly, the employer may make an (implied) offer simply by leaving the shop doors open for its unionized employees,° especially when there has been sixty days notice of intent to terminate prior to the termination of the CBA and the employer is at liberty to keep its doors shut, see 29 U.S.C.A. § 158(d)(4) (1973) (prohibiting lock-outs unless 60 days notice of termination was provided and the CBA has expired).

Turning now specifically to arbitration clauses, we think that federal labor policy condones their incorporation into an

---

Lord ed. 1990). But see United Food & Commercial Workers Int'l Union Local 7 v. Gold Star Sausage Co., 897 F.2d 1022, 1024, 1026 (10th Cir. 1990).

°See NLRB v. Haberman Constr. Co., 641 F.2d 351, 355-57 (5th Cir. 1981) (en banc) (affirming the Board's finding that "the Company manifested an intent to abide by the [national] contract," although it was not a signatory thereto, "by enjoying its benefits and abiding by its provisions," and thereupon concluding that the company was bound by the terms of the national contract) ("It is well settled that a union and employer's adoption of a labor contract is not dependent on the reduction to writing of their intention to be bound. Instead, what is required is conduct manifesting an intention to abide by the terms of an agreement." (footnote and citations omitted)); BAKALY & GROSSMAN, MODERN LAW OF CONTRACTS, supra, § 3.1.1 at 22 ("In the employment context, an implied offer may arise when an employer has previously retained an employee. The employer may ask the former employee to perform a new job without mentioning that the employee will receive compensation for it. . . . If a reasonable person would have inferred from the employer's request that he intended to pay for the services, then the employer's request will be deemed an offer."); 1 HOWARD A. SPECTER & MATTHEW W. FINKIN, INDIVIDUAL EMPLOYMENT LAW AND LITIGATION §§ 1.01, 1.02 (1989) ("[An employment contract] may be expressed in words or arise by implication from the conduct of the parties.") ("[A]n offer may be implied from the employer's actions or practices.") ("Acceptance [of an employment contract] may be made orally, in writing, or by commencement or continuing performance."); I FARNSWORTH ON CONTRACTS §3.15a, at 242 (1990) ("occasionally both the employer's offer and the employee's acceptance are implied-in-fact from their conduct" (citing, inter alia, Novosel v. Nationwide Ins. Co., 721 F.2d 894, 902-03 (predicting Pennsylvania law regarding the creation of an implied contractual "just cause" provision), reh'g denied, 721 F.2d 903 (3d Cir. 1983)))).

implied-in-fact CBA.[0]  First, federal labor policy, insofar as it is solicitous of peaceful labor relations, favors the existence of CBAs, and we will generally apply contract law liberally in order to recognize a CBA which lessens strife and fosters congenial relations between employees and management.  See John Wiley & Sons, Inc. v. Livingston, 376 U.S. at 550, 84 S. Ct. at 914-15 ("[A]lthough the duty to arbitrate . . . must be founded on a contract, the impressive policy considerations favoring arbitration are not wholly overborne by the fact that [the employer] did not sign the contract being construed."); Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 861 F.2d 1546, 1550 (11th Cir. 1988); see also Smith

---

[0] The general contract treatises maintain that if an employment contract for a fixed term expires and the parties continue their relationship, "another contract by implication of fact would arise for another similar period."  See 1 WILLISTON ON CONTRACTS § 39, at 121 (3d ed. 1959) (emphasis supplied); accord 1 WILLISTON ON CONTRACTS § 4:20, at 456 (4th ed. Lord ed. 1990); 1 CORBIN ON CONTRACTS § 18, at 43.  But federal labor law does not support that specific result; rather, under the circumstances of this case, federal labor policy just favors the formation of an implied-in-fact CBA terminable at will by either party. Incorporating the duration provision of the lapsed CBA would in most if not all instances substantially interfere with collective bargaining because, depending on what other terms are incorporated into the implied-in-fact CBA, it might leave nothing to bargain over.  Perhaps more problematically, when an arbitration clause in particular is incorporated into the implied-in-fact CBA, inclusion therein also of a duration clause could prevent the parties from marshaling their economic weapons during negotiations "if no agreement can [otherwise] be achieved."  Hilton-Davis Chem. Co., 185 N.L.R.B. 241, 242 (1970). Yet the Board impliedly found such a result contrary to federal labor policy when it ruled that arbitration procedures are exempted from the general prohibition against pre-impasse unilateral changes to terms subject to mandatory collective bargaining.  See ibid.; cf. Indiana & Mich. Elec. Co., 284 N.L.R.B. 53, 55-56, 58 (1987).  Allowing either party to terminate the arbitration provision of the implied-in-fact CBA at will, of course, eliminates any conflict with federal labor policy, because resort to ultimate economic weapons alone will generally signal an intent to terminate the implied-in-fact arbitration provision.  See supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**.

26

v. Evening News Ass'n, 371 U.S. 195, 199, 83 S. Ct. 267, 270 (1962) ("[Section] 301 is not to be given a narrow reading.").

Second, to effectuate the federal labor policy favoring the resolution of employee grievances by "a method agreed upon by the parties," 29 U.S.C.A. § 173(d) (1978), the Supreme Court has established a strong presumption favoring arbitrability of disputes between parties who include arbitration provisions in their CBAs. The Supreme Court explained the basis for this policy in Nolde:

> The labor arbitrator is usually chosen because of the parties' confidence in his knowledge of the common law of the shop [-- the practices of the industry and the shop --] and their trust in his personal judgment to bring to bear considerations which are not expressed in the contract as criteria for judgment. . . . The ablest judge cannot be expected to bring the same experience and competence to bear upon the determination of a grievance, because he cannot be similarly informed.

Nolde, 430 U.S. at 253, 97 S. Ct. at 1073 (quoting United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 1352–53 (1960)).[0]

---

[0]See AT & T Technologies, 475 U.S. at 650, 106 S. Ct. at 1419 (observing that "[t]h[e] presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements, `furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining'" (quoting Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 371–72, 104 S. Ct. 1844, 1849–50 (1984)); CLARENCE M. UPDEGRAFF, ARBITRATION AND LABOR RELATIONS 21–22 (1978) (enumerating the advantages of arbitration over litigation); FRANK ELKOURI & EDNA ASPER ELKOURI, HOW ARBITRATION WORKS 7–9 (4th ed. 1985) (same). See generally Archibald Cox, The Legal Nature of Collective Bargaining Agreements, 57 MICH. L. REV. 1 (1958). For a practiced labor arbitrator versed in the singular, byzantine universe of labor relations, it is quite likely that the retroactivity provision at issue here has a relatively clear meaning because it evinces a recognizable intent. Arbitrators are accustomed to settling disputes "that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as

Applying that policy, the Supreme Court in Nolde held that "`[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" Nolde, 430 U.S. at 255, 97 S. Ct. at 1074 (quoting United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582–83, 80 S. Ct. 1347, 1353 (1960)); see Lukens Steel Co. v. United Steelworkers, 989 F.2d 668, 672-73 (3d Cir. 1993). Even "where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." Nolde, 430 U.S. at 255, 97 S. Ct. at 1074. Litton reiterated the fact that the duty to arbitrate can outlive the CBA and reaffirmed the centrality of the pro-arbitration policy to federal labor relations law. See Litton, 111 S. Ct. at 2226.[0]

---

reflected in particular agreements." United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S. Ct. 1358, 1360 (1960). Not so for a federal court of general (albeit limited) jurisdiction steeped (at best) in the world of ordinary contract interpretation, a fact which Luden's may be banking on. Besides the other obvious benefits in prompt and inexpensive dispositions, it is in part the arbitrator's capacity -- a capacity derived from extensive experience, specialization, and submersion in the "common law of the shop" -- to locate and discern meaning and intent where judges can unearth only ambiguity and doubt that renders arbitration such a popular dispute resolution technique in CBAs.

[0]The salience of an arbitration provision to both parties as well as its weighty stature under federal labor law is further demonstrated by its membership in the set of mandatory subjects of collective bargaining. See, e.g., United Elec. Workers v. NLRB, 409 F.2d 150, 156 n.9 (D.C. Cir. 1969); NLRB v. Davison, 318 F.2d 550, 557 (4th Cir. 1963) (dicta); NLRB v. Montgomery Ward & Co., 133 F.2d 676, 685 (9th Cir. 1943); NLRB v. Boss Mfg. Co., 118 F.2d 187, 189 (7th Cir. 1941); Indiana & Mich. Elec. Co., 284 N.L.R.B. 53, 58 (1987); see also NLRB v. United Nuclear Corp., 381 F.2d 972, 976-978 (10th Cir. 1967) (grievance procedure); Industrial Union of Marine & Shipbuilding Workers v. NLRB, 320 F.2d 615, 620 (3rd Cir. 1963) (same), cert. denied, 375 U.S. 984, 84 S. Ct. 516 (1964).

28

Luden's objects, however, that our recognition that an implied-in-fact CBA arises despite an employer's announcement of its intent to terminate a CBA would render the announcement nugatory and "would altogether eliminate the significance of contract expiration or termination." Suppl. Br. of Appellee at 12-13. We disagree. First, termination of the CBA will effectively terminate those terms with respect to which <u>both</u> parties intend that result, and furthermore termination still empowers either party to repudiate the implied-in-fact terms unilaterally at any time afterwards without providing the notice required were the CBA still in effect. <u>See</u> <u>supra</u> at **Error! Bookmark not defined**. n.**Error! Bookmark not defined.**. We only hold that the termination of a CBA, standing alone, does not objectively manifest the clear, particularized intent to disavow its terms needed to prevent certain of the lapsed CBA's provisions from being instantaneously revived as part of an implied-in-fact CBA.

Either party may renege on the term at any time by clearly disavowing -- whether by word, pen, or deed -- the arbitration provision of the implied-in-fact CBA.[0] Of course, repudiation would affect only <u>future</u> disputes arising after such notice, whenever it may come, and such a termination could certainly not affect disputes involving pre-termination facts, accrued rights, or persisting rights (as measured with respect to the lapsed <u>or</u> the

---

[0] Obviously either party may prevent the implied-in-fact terms from arising altogether by repudiating them concurrently with, or in some instances before, <u>see</u> <u>supra</u> at **Error! Bookmark not defined**. n.**Error! Bookmark not defined.**, its termination of the CBA. Just as obviously, a term will never arise as part of an implied-in-fact CBA if both parties consciously do not intend for that term to survive the lapse of the CBA.

implied-in-fact CBA).⁰ That is to say, an implied-in-fact arbitration provision is in its legal effect indistinguishable from that of the standard written and undersigned one.

Second, a lapsed CBA opens the door for collective bargaining and allows the employer, once it has in good faith bargained to impasse with the union, to institute unilateral changes (in conformity with prior offers) to those terms and conditions of employment subject to the Katz prohibition against unilateral changes. See NLRB v. Katz, 369 U.S. 736, 745, 82 S. Ct. 1107, 1112-13 (1962).⁰ Finally, the term of the implied-in-fact CBA we

⁰In Litton the Supreme Court enumerated three types of disputes which, albeit flaring up post-expiration, could "arise under the [lapsed] contract:"

> A postexpiration grievance can be said to arise under the contract only [(1)] where it involves facts and occurrences that arose before expiration, [(2)] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [(3)] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

111 S. Ct. at 2225 (the "pre-expiration facts," "accrued rights," and "persisting rights" prongs, respectively).

There is no need to consider whether any of these three Litton prongs applies to the facts of this case because our conclusion that the duty to arbitrate never came to rest clearly compels the result that the dispute must proceed to arbitration. The parties' duty to arbitrate was never discharged because during the interim period between July 2 and November 4, 1991 it survived in the implied-in-fact CBA and thereafter as part of the near "agreement." The three Litton prongs, of course, apply only to disputes surfacing after the parties have been relieved of their contractual duty to arbitrate; while the duty to arbitrate is operative, the strong presumption favoring arbitration governs. See Nolde, 430 U.S. at 255, 97 S. Ct. at 1074, quoted supra at 28.

⁰Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(5) (1973), imposed on Luden's the statutory duty to continue operating according to certain existing terms and conditions of employment until the parties reached a good faith bargaining impasse, see Katz, 369 U.S. at 741-43, 82 S. Ct. at 1110-11, even

30

recognize here is restricted to an arbitration provision; it may well be that the implied-in-fact CBA does not incorporate all, or any other, of the terms of the lapsed CBA. Cf. General Warehousemen & Employees Union Local No. 636 v. J.C. Penney Co., 484 F. Supp. 130, 134 (W.D. Pa. 1980) ("Even though employees continue to work under the compensation arrangements of an old contract, the court cannot imply that the entire contract was extended." (emphasis supplied)). We cannot foretell what other, if any, terms of the lapsed agreement would similarly generally survive. But see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**. But since it is the case that the implied-in-fact CBA will incorporate at most those terms of the lapsed CBA which have not clearly been disavowed in some way and whose inclusion is compatible with federal labor policy, we can mention some potential considerations.

We do not doubt that the particulars of federal labor law affect whether or not a party may have a reasonable expectation that the other party's continued adherence to a provision of a lapsed CBA means that the other party has consented to the continuation of the provision. Although arbitration is a subject of mandatory bargaining, the Supreme Court has deferred to the Board's ruling that a party may effect unilateral changes to an arbitration provision when the CBA lapses. See Litton, 111 S. Ct. at 2221-22; cf. Indiana & Mich. Elec. Co., 284 N.L.R.B. 53, 58 (1987). We have said above with respect to arbitration provisions that, as both parties are free to modify the arbitration clause unilaterally after the lapse of the CBA, the absence of contrary

where, as here, the parties were negotiating a new agreement after the expiration of the previous one, see Litton, 111 S. Ct. at 2221.

indications generally gives rise to a reasonable presumption that the silent party has <u>agreed</u> to continue in effect the arbitration provision of the lapsed CBA.  <u>See</u> <u>supra</u> at 21.

On this basis, arbitration differs markedly from most other mandatory topics of collective bargaining, the unilateral modification of which <u>would</u> run afoul of the National Labor Relations Act ("NLRA") and amount to an unfair labor practice.  As to those terms and conditions of employment, one party's failure clearly to disavow them is logically attributable to its statutory duty preventing it from doing so and requiring it instead to maintain the <u>status quo</u>.  Thus, the other party can not generally reasonably presume that silence and maintenance of the <u>status quo</u> is due to the first party's voluntary <u>election</u> not to institute unilateral changes.[0]

The Board's primary jurisdiction over unfair labor practices also counsels against the inclusion in an implied-in-fact CBA of a term or condition which is a memberof the group of items subject to mandatory bargaining but not subject to a party's unilateral modification.  <u>See</u> 29 U.S.C.A. § 160(a) (1973); <u>e.g.</u>, <u>Kaiser Steel Corp. v. Mullins</u>, 455 U.S. 72, 83, 102 S. Ct. 851, 859 (1982) ("The Board is vested with primary jurisdiction to determine what is or is not an unfair labor practice.  As a general rule,

---

[0]Thus although we acknowledge and appreciate the dissent's concern that in some circumstances "the employer's post-termination conduct may have been based on its understanding of its statutory obligations under the [NLRA]," <u>infra</u> at X (dissenting opinion at 2), because arbitration clauses have definitively been excluded from the ban against unilateral modification of mandatory subjects of bargaining, we do not agree that this potential ambiguity is realized when the term incorporated into the implied-in-fact CBA is an arbitration clause.

federal courts do not have jurisdiction [under § 301] over activity which is arguably subject to § 7 or § 8 of the [NLRA], and they must defer to the exclusive competence of the . . . Board." (internal quotations omitted)).  But since under the NLRA it is not an unfair labor practice to abandon an arbitration provision unilaterally after the lapse of a CBA without first having bargained to impasse, our recognition of an implied-in-fact CBA incorporating the lapsed CBA's arbitration provision does not undermine the NLRB's primary jurisdiction over unfair labor practices.

Moreover, despite the fact that the Union likely could have brought its grievance before the Board packaged as an unfair labor practice charge,[0] our recognition of an implied-in-fact arbitration provision respects the Board's turf, because it

[0]There can be little doubt but that retroactive wages fall within the scope of what §§ 8(a)(5), (d), and 9(a) mandate the parties must bargain over, as "[t]he categories `rates of pay' and `wages' have been given a broad construction by the Board and the courts to cover most of the common forms of compensation for labor performed, as well as most types of agreements to protect standards of compensation."  I CHARLES J. MORRIS, THE DEVELOPING LABOR LAW 864 (3d ed. Patrick Hardin ed. 1992); see 29 U.S.C.A. §§ 158(a)(5), (d), 159(a) (1973); Capitol Roof & Supply Co., 217 N.L.R.B. 1004 (1975); cf. Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB, 927 F.2d 635, 640-41 (D.C. Cir. 1991). Consequently, Luden's was under the statutory duty not to modify the wages its employees were earning on July 2, 1991 (when Luden's termination of the 1988 CBA became effective) unilaterally, unless, of course, it first bargained with the Union to impasse (or the Union consented).  This probably did not happen prior to Luden's November 4 institution of the new wage scale.  It therefore would appear that the Union could have had the NLRB interpret Article XXIX of the 1988 CBA to determine what the wages were on July 2, but in fact it did not ask the NLRB to do so (although it did unsuccessfully bring an unfair labor practices charge against Luden's on other counts, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**). See, e.g., Derrico v. Sheehan Emergency Hosp., 844 F.2d 22, 26 (2d Cir. 1988) ("The terms of an expired agreement . . . retain legal significance because they define the status quo" from which neither party may depart before bargaining to impasse.).

implicates primarily the interpretation and application of the 1988 and the implied-in-fact CBAs, over which § 301 grants federal courts jurisdiction, not the interpretation and application of the NLRA, over which the Board maintains special expertise. See, e.g., Smith v. Evening News Ass'n, 371 U.S. 195, 197-98, 83 S. Ct. 267, 268-69 (1962) (holding courts and the Board exercise concurrent jurisdiction over breaches of CBAs that amount to an unfair labor practice). In appreciation of this distinction, the Board itself has adopted a system of prearbital deferral which exalts the parties' agreed-upon method to resolve a dispute above Board proceedings. See Collyer Insulated Wire, 192 N.L.R.B. 837 (1971). See generally II Charles J. Morris, The Developing Labor Law 1016-49 (3d ed. Patrick Hardin ed. 1992). We highlight these observations because the same might not be true for subjects of mandatory bargaining whose unilateral modification does constitute an unfair labor practice.[0]

Luden's also contends that an implied-in-fact contract approach is incompatible with Litton's concentration on the contractual moorings of the duty to arbitrate. Suppl. Br. of Appellee at 8-13. In Litton the Court announced firmly that under the NLRA "arbitration is a matter of consent, and . . . will not be imposed upon parties beyond the scope of their agreement." 111 S. Ct. at 2222. Our analysis complies with that principle, contrary to Luden's supposition, for we recognize that it generally is the parties' actual (albeit implied-in-fact) agreement to continue in effect the arbitration term of the lapsed CBA absent contrary

---

[0] We deem it notable also that our decision will not threaten to inundate the federal courts with § 301 suits which should by statutory design proceed as unfair labor practice charges before the Board.

indications.[0]  Because the duty to arbitrate we recognize is rooted

---

[0]The dissent suggests that we may be employing a quasi-contract rather than an implied-in-fact contract approach. See infra at X (dissenting opinion at 3-4).  As the preceding discussion should make clear, such is not the case.  Our approach only recognizes that the parties, by not clearly disavowing or otherwise repudiating an arbitration clause, objectively manifested their intent to continue the arbitration clause in effect; either party is entitled, however, to reject the arbitration provision at any time. See supra at 29.
The same would not be true were we to tread down the quasi-contract path, as such a "contract" is not predicated "on the apparent intention of the parties to undertake the performances in question." REST.2D CONTRACTS § 4 cmt. b (1981); accord 1 CORBIN ON CONTRACTS § 19, at 44 (defining a quasi-contract as "an obligation that is created by the law without regard to expression of assent by either words or acts"); 1 WILLISTON ON CONTRACTS § 1:6, at 25 (4th ed. Lord ed. 1990) ("Quasi contractual obligations are imposed by the courts for the purpose of bringing about a just result without reference to the intention of the parties.").  While the boundary line between contract and quasi contract may be "wavering and blurred," 1 CORBIN ON CONTRACTS § 19, at 44, the difference is real.
Instead, our conclusion is based on the "objective" in lieu of the "subjective" theory of contract formation.  The subjective theory has been roundly rejected by courts, commentators, and, of greatest moment, by this Court, in favor of the objective one.  See Mack Trucks, 856 F.2d at 592 (holding in context of a CBA that "[t]he parties' objective intent to create a contract is relevant -- not their subjective beliefs"); e.g., Warehousemen's Union Local No. 206 v. Continental Can Co., 821 F.2d 1348, 1350-51 (9th Cir. 1987); REST.2D CONTRACTS § 19(3) (1981) ("The conduct of a party may manifest assent even though he does not in fact assent. In such cases a resulting contract may be voidable because fraud, duress, mistake, or other invalidating cause."); id. § 2 cmt. b ("The phrase `manifestation of intent' adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention."); I FARNSWORTH ON CONTRACTS § 3.6 (1990); 1 WILLISTON ON CONTRACTS § 3:5 (4th ed. Lord ed. 1990); Randy E. Barnett, A Consent Theory of Contract, 86 COLUM. L. REV. 269 (1986); Clare Dalton, An Essay in the Deconstruction of Contract Doctrine, 94 YALE L.J. 997, 1042-45 (1985).  A famed, if hyperbolic, depiction of the objective theory was made by Judge Learned Hand:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties.  A con-tract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent.  If, however, it were proved by twenty bishops that either party, when he used the words, intended something else

in an implied-in-fact CBA, a contractual agreement which like any other is predicated on the parties' manifest intent and not on any statutory or legal duty, cf. Indiana & Mich. Elec. Co., 284 N.L.R.B. at 57, our decision does not run afoul of Litton's teachings that a court must decide whether an issue is arbitrable, and that it must do so on the basis of the parties' contractual consent thereto, see Litton, 111 S. Ct. at 2222, 2226, 2227.

IV. CONCLUSION

For the foregoing reasons, we hold that in a continuing employment relationship an arbitration clause may survive

---

than the usual meaning which the law imposes upon them, he would still be held, unless there was some mutual mistake, or something else of that sort.

Hotchkiss v. National City Bank of N.Y., 200 F. 287, 293 (S.D.N.Y. 1911), aff'd, 201 F. 664 (2d Cir. 1912), aff'd, 231 U.S. 50, 34 S. Ct. 20 and 231 U.S. 60, 34 S. Ct. 22 (1913).

The dissent correctly points out that the record does not disclose the parties' subjective understanding of the implied-in-fact CBA. See infra at X (dissenting opinion at 2). Since we are proceeding under an objective theory of contract formation, and since the record does not disclose that both parties in fact intended for the arbitration clause to cease existing, the natural result is to give effect to the parties' objective manifestations of intent. The formation of the implied-in-fact CBA would not be defeated just because one party was not sure whether a right under a term of the the lapsed CBA continued in effect; parties often have doubts about the precise contours of their rights and obligations, even under well-drafted written agreements, and such uncertainty does not negative the right. Assuming an objective manifestation of intent by both parties necessary for the formation of an implied-in-fact CBA, a term may be included as a part of the CBA unless both parties subjectively intended that it not be.

The burden to come forward with evidence that no implied-in-fact CBA arose because both parties intended it not to arise naturally rests on the party attempting to avoid being bound by its objective manifestations. The same holds true for any particular term which the implied-in-fact CBA would otherwise incorporate.

the expiration or termination of a CBA intact as a term of a new, implied-in-fact CBA unless (i) both parties in fact intend the term not to survive, or (ii) under the totality of the circumstances either party to the lapsed CBA objectively manifests to the other a particularized intent, be it expressed verbally or non-verbally, to disavow or repudiate that term. This result injects substantially more stability and certainty into labor law, and promotes the primary statutory objectives of peaceful and stable labor relations underpinning the NLRA, at the slight cost of a notice requirement forcing a party to make clear its wish no longer to abide by the arbitration clause.

In the circumstances of this case, where neither party in any palpable way challenged the continued vitality of the arbitration provision in particular (as opposed to the CBA as a whole) before the dispute erupted, and where no evidence shows that both the parties in fact intended their obligation to arbitrate grievances to be discharged, we think that the parties' duty to arbitrate grievances according to the terms of their 1988 CBA was never totally discharged. In other words, Luden's general, undifferentiated termination of the 1988 CBA effective July 2, 1992 merely transmuted the parties' duty to arbitrate into a term of an implied-in-fact CBA which the parties formed on that date.

Accordingly, we will vacate the order and injunction entered by the district court, and will remand with instructions to direct the parties to proceed to arbitrate the retroactive wage grievance. The parties shall bear their own costs.

37

Luden's Inc. v. Bakery, Confectionery and Tobacco Worker's

International Local Union 6

No. 92-1982

ALITO, Circuit Judge, dissenting.


I would affirm the decision of the district court. For essentially the reasons explained by that court (see Luden's Inc. v. Local Union No. 6, 805 F. Supp. 313, 323-27 (E.D. Pa. 1992)), I would hold that the union's grievance concerning the retroactivity of the proposed wage increase was not subject to the arbitration provision of the terminated 1988 collective bargaining agreement.

I would not reach the theory on which the court's decision is based, i.e., that the parties, upon the termination of the 1988 agreement, entered into an implied-in-fact agreement containing an arbitration requirement similar to that in the 1988 agreement. The union did not advance this theory in the district court or in its brief in our court. Indeed, the union does not appear to have relied on the theory of an implied agreement until after this court requested the parties to submit post-argument memoranda addressing this subject. Under these circumstances, I do not think that it is necessary or appropriate to reach this theory, which may have considerable precedential importance.

While I am not willing, without the benefit of full briefing and argument, to express any conclusive views concerning

the court's theory, I will say that I have reservations about the correctness of the court's analysis. At the outset, I am uncertain that the parties reached any implied-in-fact agreement after the 1988 agreement was terminated. I agree that a party's conduct following the expiration of a contract may manifest assent to be bound by a new, tacit contract, but I am not sure that the conduct of Luden's in this case manifested such assent. After all, Luden's took pains to terminate the 1988 collective bargaining agreement. While it appears to be true that "Luden's kept the doors to its business open, invited its employees to enter, and conducted business as usual" (Maj. typescript 19), I am not sure that this conduct should be interpreted as a manifestation of assent to a new, tacit contract, particularly since federal labor law placed limitations on Luden's ability to engage in a different course of conduct. See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198-99 (1991) (concerning an employer's unilateral changes in terms and conditions of employment); Stokely-Van Camp, Inc., 186 N.L.R.B. 440 (1970) (concerning pre-impasse lock-outs).

Even assuming for the sake of argument that the parties entered into some type of implied agreement, I am not certain that this agreement also contained an arbitration requirement. The rules set out in section 201 of the Restatement (Second) of Contracts seem potentially applicable. That provision states:

> (1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

> (2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is

40

interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.

(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

Under the these rules, the meaning attached by each of the parties is important, but in this case the record does not disclose what meaning either party attached to the implied agreement when it was formed. In particular, the record does not contain any stipulation or affidavit indicating that either party believed that the implied contract contained an arbitration requirement. Consequently, I find it difficult to see how the court can hold at this juncture that the implied contract included such a requirement. On the assumption that the issue of an implied-in-fact contract is properly before us, I am inclined to think that the most that the court could do is to reverse the award of summary judgment for Luden's and remand for further proceedings (and perhaps for a trial) on the question whether the implied-in-fact contract contained an arbitration agreement.

Because the court does not seem to be concerned about the meaning that the parties attached to their putative agreement, the court's decision does not appear to be based on a contract that is implied in fact, that is, "an agreement . . . founded upon a meeting of minds, which, although not embodied in an

2

express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." <u>Baltimore & Ohio R.R. v. United States</u>, 261 U.S. 592, 597 (1923). Rather, the court's decision seems to be based on "an agreement `implied in law,' more aptly termed a constructive or <u>quasi</u> contract, where, by fiction of law, a promise is imputed to perform a legal duty." <u>Id</u>. The court summarizes its holding as follows:

> [W]e hold that in a continuing employment relationship an arbitration clause may survive the expiration or termination of a CBA intact as a term of a new, implied-in-fact CBA unless either or both parties in fact intend the term not to survive, or under the totality of the circumstances either party to the lapsed CBA objectively manifests to the other a particularized intent, be it expressed verbally or non-verbally, to disavow or repudiate that term.

Maj. typescript at 34. This flat rule is suggestive of an obligation that arises by operation of law, not one based on an actual, albeit tacit, agreement between two particular parties.

If this interpretation of the court's decision is correct, I have serious reservations whether that decision is consistent with the Supreme Court's refusal in <u>Litton</u>, 501 U.S. at 200-01, to recognize a legal duty to arbitrate disputes arising after a collective bargaining agreement expires. In <u>Litton</u>, the Court "reaffirm[ed] . . . that under the NLRA arbitration is a matter of consent, and that it will not be imposed upon parties beyond the scope of their agreement." <u>Id</u>. at 201.

For these reasons, I am not willing at this point to endorse the court's analysis, and I therefore respectfully dissent.